JAMES H. WIGGINS, Appellant, v. LOUISE M. WIGGINS, Appellee.

No. 47292.

(Reported in 34 N. W. 2d 607)

NOVEMBER 16, 1948.

1280

Jordan & Jordan, of Cedar Rapids, for appellant.

George C. Claassen, of Cedar Rapids, for appellee.

BLISS, J.—Plaintiff, then about twenty-one, and Louise M. Indra, then about twenty-eight, were married on November 11, 1938. For two or more years they lived in an apartment in Marion, Iowa. On June 17, 1941, his parents, H. W. and Bessie R. Wiggins, executed a deed conveying to plaintiff and defendant jointly a square acre of ground just across the road from the farm home of the parents. On this lot the young people built a comfortable home costing about $5000. It was not completed upstairs and required other finishing, but they occupied it in 1941. Fearful that no child might be born to them, they legally adopted, when he was five days old, the boy whose custody and control is involved. The child was born on February 14, 1942. The relations between the occupants of the new home and those in the parental home across the road were pleasant and friendly. Defendant's mother was dead but defendant's father and her sisters were often in her home. A sister of plaintiff, a few years older than defendant, lived with her parents. She clerked in a store in Marion but lived at home. On many occasions when plaintiff and defendant went to shows or other places, or defendant attended a bridge game or other social affairs, the baby boy was left in the foster grandparents' home across the road. There is no evidence of any serious friction between the families although defendant testified that the grandmother sometimes asked where they were so late, and two of defendant's sisters testified that it was apparent that she made life unpleasant and difficult for the young couple, and that she never liked Louise.

Concerning the divorce, defendant testified: "Along about February 1944 * * * Jim came to me and asked for a divorce, and the shock was so great that I passed out completely." At

that time plaintiff carried the baby to his parents' home. His mother telephoned a sister of defendant to come out. Defendant's father and two of defendant's married sisters came at once to her home. They testified that they found defendant crying hysterically and very nervous and upset, and that she told them Jim wanted a divorce and that she did not. This continued for some time and her father stayed with her in the home. The sisters were back and forth. Just what was the cause of the marital discord does not clearly appear. Defendant gave no testimony about any trouble between them or any grounds for divorce. Plaintiff testified that there had been considerable discussion between them of differences and of divorce after he had learned that she discussed with some adviser as to whether she should get the divorce. This was prior to the time that her father and her sisters had come out to the home. The defendant testified that the divorce had been becoming more apparent for six months. These sisters, Mrs. Dvorak and Mrs. Hoyt, testified that when they asked Jim what the trouble was he told them that Louise was unhappy and he wished a divorce. In the conferences between plaintiff and defendant and her family a divorce and a division of their property and the custody of the boy—then two years old—were agreed upon. Defendant had put $1903 of her money into the home and she was to receive that much money from plaintiff and $500 in alimony. A division of the household goods was made. It was settled and agreed that plaintiff was to have the custody, care, and control of the adopted child, with the right of Louise to visit him on suitable occasions. Each party was to pay his or her own attorney fees. Both parties consulted Judge HAAS, now deceased, who was then in the practice. In other litigation he testified that defendant and her father and sisters consulted him about the divorce four or five times, and on one or more of these occasions the plaintiff was present. He prepared the stipulation for settlement of property rights and custody of the adopted child, as above noted, from a written memorandum prepared by defendant and one of her sisters. The stipulation as prepared by Judge HAAS was executed in triplicate by the plaintiff and defendant on February 21, 1944. Judge HAAS had testified that there was some discussion as to whether the

wife or the husband should bring the divorce action. Defendant in the present action testified that since it was against her religion as a Catholic to have a divorce she would sign the papers—her written appearance, waiver of time of hearing, and consent that the cause might be heard at any time without further notice to her. She had previously been served with an original notice. On March 17, 1944 the case came on for hearing before Judge Linville on the plaintiff's petition and evidence. The court found the allegations of the petition were true and that plaintiff was entitled to a decree of divorce and relief as prayed, and entered such decree, including the stipulation, on March 17, 1944. The child was in the grandparents' home at that time and at the time the stipulation was signed. She received a certified copy of the decree and within ten days thereafter the $2403 she was entitled to thereunder. The decree restored to the defendant her maiden name, Louise M. Indra, which she now bears. She testified that her father was living in a single room and she had no home to go to. She sold at public sale a part of the household furnishings she had received in the settlement, and for a time lived in the homes of her married sisters and of a brother. One of the sisters is childless and another has a little boy. The defendant testified:

"I have another sister living just across the park a ways. She hasn't any children and would be glad to take care of him [Donald]. She has offered many times to take care of him while I worked. She would be glad to take care of him when I could not take care of him."

There was no attempt to place the child in the home of any brother or sister when his care and custody were being discussed at and before the divorce. They sheltered her and they no doubt would have cared for the child had defendant desired. She contends that she was so distraught and physically and mentally ill and homeless that she could not care for the child. She testified that the plaintiff was to have the child only temporarily and during that time he was not to be taken to his father's home but was to be cared for in his own home by a housekeeper. She said she relied upon these arrangements. A quite improbable story. Where was there a better place for this two-year-

old baby than with his foster grandparents? They had cared for him and fondled him and played with him many times in their home and in his home. He had known them and his spinster aunt all of his short life. Defendant knew he was there during the month or more before the divorce was granted, because she complained that when she and her father called at the elder Wiggins home during this time they could not see the baby because he was having his nap.

She testified: "I learned shortly after the divorce that the child was not living at James' place. *I was so broken up, I just wanted to forget everything, but I couldn't, and I knew he wasn't there with Jim, he farmed him out to his folks.*" What a terrible catastrophe that a little boy should have no shelter, or care than that of his grandparents! She said that she had no home for him, that "I couldn't take the child out in the street", and yet she was in the depths of despair because her adopted baby had a good home. It is strange that if the custody of Jim was to be but temporary that she, by conference and by written stipulation, "settled and agreed that the custody, care and control" of Donald should be in Jim, free from her control. She and her sister made a long detailed list of personal property that she was to get, not omitting the "cash" she invested in the home, and the $500 alimony. It is passing strange that neither she nor her nondistraught father and sisters did not tell Judge HAAS in their conferences with him that James Wiggins' custody and control was only temporary, if that was the agreement. There is nothing in the record to cause defendant to become all broken up because the baby was with Jim's parents rather than with Jim. They were good Christian folks and respectable citizens. No neighbor or person in Marion was called to say anything to their discredit. Of them the defendant testified:

"I was friendly with the little boy's grandparents. I try to be as friendly as I can with them. I like them very well. I liked the sister Mr. Claassen calls a spinster as well as I could. I like her fairly well now. They are nice people. * * * Before the divorce it was natural for us to be over at the Wiggins home. Yes, they became well acquainted with the little child.

1284

* * * I belonged to a bridge club that met about once every third week of the month, that would be about the only time, outside of any special occasion, I asked them to take care of him, and they were willing to do it for me. * * * When I left, the little boy was two years old. He is five now. Right back there. He seems to be healthy and happy. * * *. Q. And the little child has known all its conscious years the grandfather, grandmother and aunt, as well as the father, is that true? A. Well, he was quite small and did get acquainted with them."

Defendant said she was broken up when she learned that the boy was not in Jim's home. But her later actions did not indicate much interest in the preservation of that home for either Jim or the boy. Notwithstanding, the stipulation and decree in the divorce action effected a full settlement of their property rights, by which defendant was fully reimbursed for her money investment in their home, and the fact that the plaintiff invested more money in the improvement of that home after the divorce, so that the entire value of the improvements on the unimproved acre, represented an investment of his money alone, on or about December 6, 1944, the defendant brought an action to partition or sell this home of the plaintiff herein. She prayed that she be awarded one half of the value of the improvements on the lot. During the pendency of the suit and on March 7, 1946 the place was sold for $8250. The district court, Judge THOMPSON presiding, denied the money award asked by the petitioner, and said: "It is the opinion of this court that it is an afterthought upon the part of the divorce-defendant, now Louise M. Indra, and that as a matter of equity and fairness her claim entirely lacks foundation." The trial in that case was begun on March 19, 1946 and the decree was rendered on April 24, 1946 and affirmed by this court on July 29, 1947 (Indra v. Wiggins, 238 Iowa 728, 28 N. W. 2d 485).

On August 7, 1944 the plaintiff married Irene Blackledge, then thirty-six years old. Her mother and her niece, about twelve years old, also became occupants of plaintiff's home. The new wife had some money which was used in paying a mortgage of $3000 on the home, and in completing and improving it. If defendant was disconsolate when she learned that the baby was in the grandparents' home and not in Jim's home with a

housekeeper, she changed her attitude on learning of the second marriage. In her cross-examination this appears:

"Q. And you felt during this time [pendency of the litigation] this little child was being taken care of by its foster grandparents, that that was a better place for the child to be than with its father and the lady you referred to that he married? A. I thought at the time it was—after he married that other woman I thought it was—until I couldn't stand to be away from him any longer, and I want him now; I don't think it is the place for him now. Q. You make no criticism of the fact the father has felt it was best for the child to leave it at the place where it was when the court gave him custody of it, rather than to take it home, do you? A. He never talked it over he was going to leave him there. Q. The fact is you preferred to have the child where it is rather than with his present wife and where he is now living, is that correct?"

On defendant's objection the witness was not permitted to answer. It was the evident position of defendant that not only the grandparents but any housekeeper in Jim's home were preferable to her for the care of the child over Jim's wife in Jim's home.

The defendant testifies with fervor and emotion of her desire to have the boy with her and her family:

"He is all I have to live for and I just can't stand it without him, he is in my mind day and night and at work and all, and I have just got to have him. James has never talked to me about, or helped me get to see the child. He wouldn't even try to. He married a woman old enough to be his mother a short time after the divorce. * * * My sister said she would take care of him for me. I have three sisters and two brothers living in Cedar Rapids. One sister lives about two blocks. She has a little boy five, who would be a very good companion for Donnie, and I think that's what he needs, is young companions."

These are spoken words. These are promises. Let us see what the undisputed and unquestioned facts are, and what concrete and actual expression of her love and regard for the boy is shown by the record. Plaintiff testified that defendant

complained of the care that the little boy was. Her sisters spoke of her good care of the child. All witnesses, but one who testified for plaintiff, were interested members of the families. Interest of the witness is a factor to be carefully considered in weighing the witness' testimony.

This trial began on February 24, 1947, approximately three years after the child was taken to the home of plaintiff's parents just across the road from the home of Jim and Louise. During the following month, preceding the decree of divorce, defendant had no difficulty in consulting with Judge HAAS. She made one call at the Wiggins home to see the baby and it was asleep. There is no evidence that during that month she called again or made any inquiry about the child. She took her possessions and left plaintiff's home and never returned to it. Her mental and physical illness, if such she had, did not prevent her from getting employment at once. She began working at the Century Engineering Corporation in Cedar Rapids and continued in its employ "for about a year, I would say." The day after this employment ended she began work at the Three Minute Cereal Company or the National Oats in Cedar Rapids—the defendant uses each name in her testimony—where she was working at the time of the trial. In September 1944, the foster grandparents moved from their farm outside of Marion, with their daughter and the little boy, to an acreage with a good modern home on it, in the outskirts of but within the corporate limits of Marion, where they were living at the time of the trial. After James Wiggins sold his home in March 1946, he moved at once to the 240-acre farm of James Smith, Linn County Sheriff, just north of Mount Vernon, about twelve miles from the elder Wiggins home, where he and his household were living at the time of the trial.

There is no evidence that Louise M. Indra, from the time she called at the Wiggins home with her father in February 1944, when the baby was sleeping, until July 7, 1945, ever communicated with, called upon, or contacted in any way, any member of the elder Wiggins family or with Jim or any member of his family, with respect to the baby, or attempted to do any of these things. During this sixteen-month period she was living in Cedar Rapids but a few miles from the little boy.

The automobiles of her father and family and transportation thereby were hers for the asking. This is conceded. Convenient streetcar service was available to her between Cedar Rapids and Marion. But she never visited either Wiggins home during this time. Telephone lines connected her abodes and the Wiggins homes. Pay stations were accessible. But during this period she was not keeping a record of her telephone calls to Marion, nor were her ever-present sisters at hand listening in for the click of the receiver as it was "hung up on her"—because no such message was sent or attempted. Uncle Sam was carrying the mail but defendant used no postage for letters, cards or packages to little Donnie or to those caring for him. No birthday cards or valentines from defendant greeted him on February 14, his natal day, in 1944 or 1945. The sisters were not present during those sixteen months to witness her drop letters in the mailbox to any of the Wiggins family. No copies of any such letters were kept, because no originals were mailed. Santa Claus hung no toy or little garment from her on his Christmas tree nor put a little sled from her under its branches on Christmas Eve, 1944. Donnie received no Mother Goose Rhymes, the delight of every youngster, from her. No, not even a modern Comic Book. What we have said just above applies to her father and to every member of his family. Furthermore it was testified at the trial in the late winter of 1947, of defendant, that "she never at any time sent it [the child] anything or gave it anything." This testimony is not denied. Such conduct, such neglect, such complete absence, during the period noted, of all those tender tokens of affection and regard and of those endearments and adoring attentions which universally and unrestrainedly well up in the heart of every parent, natural or foster, as an expression of enduring love and grave concern for his or her little child, quite effectively belie the testimonial protestations of defendant of her love and desire for the child, and of anguish for their separation. Defendant has neither given nor attempted any adequate answer or good reason for this neglect. There are none. It does not suffice that she may not have had the living quarters that she thought suitable for the child.

She testified:

1288

"After I stayed away from him [the child] for a few months I couldn't stand to be away any longer and decided I wanted to see him. I attempted to make arrangements to see the child by contacting Jim. I called him July 7th, and asked him if I could see Donnie, and he said he would go to his folks and see what could be done about it, and I says, 'All right', and I called about a week later and he says I couldn't see him and hung up the telephone." In the same examination just a little while later she testified: "I have all the receipts of the telephone bills and the dates of the telephone calls. I made two telephone calls in July, the 7th and 8th. This was in 1945. When I got Jim the 7th or 8th, I just talked to him about seeing Donnie, and he said he would go and see his folks and see what could be done about it."

It is apparent from this testimony that the "few months" she stayed away from the child were in fact in excess of sixteen months. It is also clear that her first attempt to contact any of the Wiggins family by telephone was on July 7, 1945. She said she had all the telephone bills and the dates of all the telephone calls. They were listed in defendant's Exhibit A, as follows: "Nine lists of Long Distance Telephone Calls, showing calls to Marion on the following dates: July 7, July 8, August 26, September 7, September 15, September 22, October 5, October 9, November 3 [1945], March 5, September 20, December 2, [1946]. Geo. C. Claassen."

There was no contact or attempted contact in any way with the child or any of the Wiggins family by defendant or by anyone for her between the time the child was placed in the care of plaintiff's parents in February 1944 and July 7, 1945.

Of the telephoning on July 7 and 8, 1945, plaintiff testified:

"It was in July, and this particular day when I came home from working in the field my wife said that there was a phone call for me and the party said they would call back again; the next day I happened to be home when the call came and it was Louise Indra, and she wanted me to bring the boy down to the park here in the Rapids so she could see him; I said, 'Well, I will make arrangements for you to see him where he is now, at my parents'; I said, 'You are welcome to go there—

and see him'—and following that I hung up on her. I couldn't tell you the exact date I was to go with the child and meet her in the park. It was the Sabbath day. When she asked me to meet her I refused, but I told her she could go see the child. * * * A year and a half passed before she went out to see the child after the divorce, during which time the child was with my parents and sister. I went to see the child at least every week, and I supported it. * * * The time she attempted to make arrangements with me to meet her in the park with the child was the only time she contacted me about it. The child is now with the very same people he was with at the time the divorce was granted and the custody awarded to me. When I took it over and asked my parents to care for it she did not state whether she cared for it or not. During the divorce proceedings she made no request that the child live with her."

On July 23, 1945, Mr. Claassen for the first time wrote to Mr. and Mrs. H. W. Wiggins, parents of Jim, about complaints of Miss Indra for better arrangements in seeing the boy. He suggested that there was probably fault on both sides. His letter clearly indicates that when the custody and control of the child was given to Jim that it was not a temporary arrangement. He suggested that there be better co-operation between them in the matter of Miss Indra's visiting with the child. The letter stated: "I think it is unfortunate in the first place that this girl agreed to have the child go to your son, especially in view of the developments that came along immediately afterwards."

The "developments" were no doubt the unconscionable claim made in the late summer of 1944 by Miss Indra which culminated in the partition suit brought on December 6, 1944.

Mr. Jordan replied to Mr. Claassen's letter on July 28, 1945, as follows:

"Your letter in behalf of Louise Indra, dated July 23, 1945, has been received by Mr. and Mrs. H. W. Wiggins, and, in order to cooperate with your client, we suggest that your client is welcome at any time to the home of Mr. and Mrs. H. W. Wiggins, where she may see the child and have it with her. A little better arrangement will be made later on.

"All your client's previous effort to see the child has been the suggestion that her former husband bring the child down to Cedar Rapids to meet her in the park.

"Please rest assured that we want to cooperate with you and Mrs. Wiggins [Louise Indra] so that she will not lose track of the child. * * *."

Miss Josephine Wiggins, forty-two, the unmarried daughter in the elder Wiggins home, on cross-examination testified:

"I answered the telephone when Louise called—I wouldn't say on how many occasions—I would say twice. The first time she called and asked to see him, she did not get to see the child. She called the following week. She called on a Friday night; she asked to come to see him on Sunday afternoon, at which time I told her that she could. That was the occasion when she played with the child in the yard."

Of this visit the defendant testified:

"The first time I went up to Marion to visit the boy was around the 9th of September, last year, 1945. Mrs. Wiggins met me. They asked me to come in, and of course when I went in they didn't tell me to take my coat off, or anything I just went in and sat down. After while Donnie came in and I gave him a little book, to read to him, and he came out and sat on my lap; and then after a while they says, 'Will you remove your coat', and so I took my coat off, and Donnie got to playing and brought a ball out and we played quite a bit there * * *. Afterwhile the baby got up and went outdoors and I followed him out. * * * so we played out there quite awhile, then afterwhile it was getting late so we decided to go back in the house. On that occasion I did not quarrel with them in any way. I was very nice to them—as nice as I could be."

While playing with the baby she said she overheard some remarks between Josephine and her mother that were not very nice.

This first visit to the child was over eighteen months after the inception of the divorce discussion. Although she knew by

the stipulation and the divorce decree that she had a right to visit the child on suitable occasions, and she had been told by the plaintiff and his attorney that she was welcome to the Wiggins home at any time to see the child, she never came back to that home until about eighteen months later. In the interim, instead of getting on the streetcar and riding out to see the boy as her leisure permitted, she persisted in telephoning and writing to the Wiggins home for visiting appointments. This was during the time that the partition action was pending. Naturally the relations between Miss Indra and the Wiggins families were not very cordial for that reason. That case came on for trial on March 19, 1946, and on April 5, 1946 the court filed its findings of fact, conclusions of law and opinion, all adverse to Miss Indra. On April 24, 1946 the decree was entered and on May 23, 1946 Miss Indra appealed to this court. After the trial in that case and before and after the decision of the district court and the appeal to this court, this defendant continued to write letters to Mr. and Mrs. H. W. Wiggins and Josephine for visiting appointments. They did not answer these letters but left it to the defendant to choose her own times for making the visits. Plaintiff's application for modification of the decree was filed July 2, 1946.

In August 1946, the attorneys arranged for the defendant and her sisters to take the little boy for a week's outing at Clear Lake. The Wiggins family brought him to the home of defendant's sister the evening before the trip. He was only about four and one-half years old and these people were all strangers to him and naturally he objected to being left with them and fought and cried loudly. But he was taken and on his return the Wiggins family took him back to their home. They testified that the boy was weak and sick and had lost weight and was running a temperature, and was in bed, under a doctor's care, after his return from Clear Lake. The sisters testified that they weighed the boy when he came and when he returned and he had gained a pound or more, and that they took his temperature before he was taken home, and it was normal. Rather letter-perfect testimony. A few days later the defendant and Mrs. Dvorak drove to the Wiggins home with some of the boy's clothes that had not been returned. The boy

was in bed and defendant did not see him. This was the second and last visit that defendant had made to the Wiggins home.

Section 598.14, Code, 1946, provides that when a divorce is decreed, the court may make such order in relation to the children as shall be right. "Subsequent changes may be made by it in these respects when circumstances render them expedient."

The decree of divorce, as provided in the stipulation of the parties, awarded the custody and control of the child to the plaintiff, its foster father. He was a fit and proper person for that obligation in every respect, except that he could not give the child the direct and personal care and attention which it then needed. It was necessary that such care be immediately provided. With defendant's knowledge and consent he took the child to his parents' home. The occupants of that home were his father, then seventy-three, his mother, sixty-six, and his unmarried sister, Josephine, thirty-nine. Each of them had known the two-year-old youngster since he was five days old. They had fondled him, cared for him, attended to his physical needs, and loved him. They were, and are, good, worthy persons in every respect and eminently capable of properly caring for this child. Not even defendant seriously contends otherwise. It was a moral, Christian home. Defendant testified: "The Wigginses are good church people, members of the Congregational Church. I am a good church person. I am a member of the Immaculate Conception Church of Cedar Rapids. My father doesn't belong to any church." No objection is, or can be raised to the religion or church affiliation or religious beliefs or practices of anyone involved. The little boy was fortunate in the home that opened to him. He has received the personal attention and love of each of them. He is strong and healthy and happy. There is no question about this. It is not required as a matter of law that the legal custodian of a child should have him in his abode, or personally and directly attend to his daily needs. While plaintiff's parental home is the home of the boy, it is undisputed that he sees the boy not less than weekly and keeps supervision and watch over him. He bears the expense of his care. The boy has been often in his home both before and since he has been operating the Smith farm. There is no

evidence that he does not love the child. It is all to the contrary. The evidence is that he is a worthy and industrious young man of good morals and Christian principles. No one contends to the contrary. His farm equipment and livestock show him to be a capable and prosperous farmer. He was reared in a good home. That is where his son is and has been since defendant left him. Of that home the elder Wiggins testified:

"I belong and attend church, as does my wife and also as does my daughter. The little boy will be raised under good Christian influence—he goes to Sunday School and church with us. * * *."

His wife testified:

"My husband and daughter and myself have taken care of him in sickness and in health. We have looked after all his wants and nursed him in his sicknesses, and we are all in love with the little fellow. * * * My health is not too good. I am able to help with the care of the child. My daughter is working now and I have him in the daytime, but she is home on Saturday and nights and mornings. There is some woman there all day with the child, and my husband is there. He takes a lot of interest in the child."

Josephine Wiggins testified:

"Donnie has been taken care of by our family. We have all been able to take care of him. His health has been very good. He has been happy. * * * He sees his father at frequent intervals. His father has great affection for him. I couldn't love him any more if he were my own child."

None of these witnesses spoke unkindly of defendant.
James Wiggins testified:

"I was in a position to observe the feelings my father and mother and sister displayed toward the child, and I observed the baby was most content there and better cared for than by my wife. There has been no change in the attitude of my father and mother and sister toward this baby since the baby was taken into their home. The baby is very well taken care of and kindly

treated there. \* \* \* I have the child at my home frequently. \* \* \* At the time the decree was rendered the baby was with my father and mother. It has been with them since that time, except when I visited it and had it visit me. I left the baby with my father and mother as it was happy and content, so why change it. I could see they were devoted to the child. I love the baby and would by all means be willing, if it was for the best interest of the child, to take it into my own home. I help take care of and support the child. I have not tried to prevent Louise Indra from seeing the child. \* \* \* This little girl [his wife's niece] lives with me, and the little boy is my son. My home is open to the little boy any time. My sister appears to love this child very much. \* \* \* The child has been to my home frequently with my father and mother. It has on repeated occasions stayed in my home overnight. \* \* \* The boy will be going to the Marion schools when he starts to school. \* \* \* I plan to educate the child and to give it religious training and rear him into a fine man. I have that intention, and at the present time he has religious training and he has young playmates that are beneficial to him, and he has all he needs, that a boy his age should have."

Mrs. James H. Wiggins testified:

"I know the little boy and care for him and am willing and anxious that he should have close touch with his foster father. He is at all times welcome to my home. If he were staying there Louise Indra would be welcome to come there to see him."

She was not cross-examined.

Mrs. James H. Smith and husband own the farm that plaintiff and his wife operate. She testified that she knew them when they lived in the bungalow and has been in their home on the farm and is acquainted with their dispositions and outlook on life and their love for children.

We have fairly and fully set out the record showing the wholesome circumstances and conditions in which young Donald Wiggins has been living since the defendant surrendered him to plaintiff, up to the time of the trial, and the propitious

outlook which the future holds for him. The record shows no change since March 17, 1944 in the status then existing and no reasonable indication of any material change in the near future. The only change suggested by defendant is that of the advancing age of the foster grandparents. Mrs. Wiggins was sixty-nine in March 1947. Mr. Wiggins was seventy-six in July 1947. Josephine was forty-two. James was born in 1917. His wife was thirty-nine at the time of the trial.

Mr. Wiggins, senior, probably has not many years left, but he is in good health. Mrs. Wiggins concedes that her health is not "too good", but she does her own work. She must be careful not to overdo. However, she is no older than John Indra, the other occupant of the home of the defendant, who would have the care of Donnie, if he were in that home, during the working hours of Louise. Nothing is shown about his health. He is retired and is now seventy years old. The prospects are that Josephine, but a few years older than Louise, will be in the Wiggins home for many years to give any needed help in the care of the boy. But when the time comes that the care of the boy is too burdensome for the occupants of the parental home, James Wiggins and wife stand ready and willing to take Donnie into their home. There are few, if any, better homes for a husky, healthy boy than on a farm. And perhaps by that time the *aged* mother-in-law who is mentioned in appellee's argument may be peacefully at rest. If not, the farm home will not be overcrowded. Jim cannot be justly criticized for making a home for his wife's mother and niece. It cannot be held that Donnie thereby suffered. On the age issue the advantage is all with the plaintiff.

■ What does defendant offer as a better home and surroundings and a better prospect, than this boy has who will be seven years old next Saint Valentines Day? When divorced she had household goods sufficient to furnish a suitable abode for herself and the boy, if he were with her. She had at least $2500 but later had protracted and unsuccessful litigation. She did not have what she regarded as a suitable home. She had the health and ability to work. She was a money earner before her marriage. Sometime in the summer or early autumn of 1945 her father built a small but comfortable home and she became

his housekeeper. Since her divorce she had been employed. At the time of the trial her take-home pay was $26.70 a week. She went to work at 7. a.m., had lunch time off, and quit at 4 p.m. She had Saturdays and Sundays for her own time. If the boy were with her she would ordinarily be at work before he arose. It would be for her father to give him such attention as he needed. Her place of employment was two blocks from the home. She had the promised aid of her sisters. A court is not justified in basing a decision on promised gratuities. She testified that he would attend with her the church of her religion, and she was not sure whether she would send him to the parochial school or the public school. Her offer is fine and commendable but it promises no advantages or improvement over what the boy has now, and had at the time of the divorce, either in home life, or materially, socially, spiritually, or in education. No doubt he entered the public school at Marion a month ago in September.

. The court in its supplemental decree made some findings as between defendant and plaintiff which discriminate against the latter. In our judgment they have no adequate foundation in the record.

This young boy came into the world apparently under a handicap. Then his foster home was broken and the roots of the immature being were disrupted. He was transplanted into the welcoming soil of another home where under the kindly care and nurture of loving hearts and hands the roots of his young life have grown deeply and its tendrils have attached it to the lives of those about him. It would be, in our judgment, a serious mistake to uproot him again. He is almost seven years old and has become a stranger to the defendant and her family. In large part, defendant, by her neglect in the first sixteen months of their separation is much to blame. In the remaining months the relations between the defendant and the plaintiff were strained through litigation, which she instituted. When she lost in that, she promptly brought this action. We are not condoning any indifference on the part of any of the Wiggins family. If she had reason to complain, any judge of the district court would have given her relief.

But the proper relief is not to change the custody under

the facts. The duty of the court is to do that which is best for the child and not to punish either party to the injury of the child. Barish v. Barish, 190 Iowa 493, 499, 180 N. W. 724.

In Jensen v. Jensen, 237 Iowa 1323, 1332, 25 N. W. 2d 316, 321, we quoted with approval this statement: " 'When a child is legally placed in a home where it receives good treatment and moral training, it should never be removed from that home, except for the most cogent reasons.' " That burden was upon the defendant and she failed to meet it.

In Knochemus v. King, 193 Iowa 1282, 1285, 188 N. W. 957, 959, we said:

"If the person in care of the child at the time its custody is sought to be changed has looked after its social, moral and educational interests for many years, and the child itself has become attached to the environment and the people who have made possible the happiness of its early years, a court is not justified for slight reasons to change that environment and transfer the custody to another. * * * It would be fundamentally wrong, both in law and in morals, to sever the relations of a child from those who have nursed, loved and cherished it for a long period of years * * *."

The supplemental decree is reversed, and it is ordered that the original decree in the divorce action shall stand as entered. The district court is directed to make entry in accordance herewith.—Reversed and remanded.

OLIVER, HALE, GARFIELD, WENNERSTRUM, MULRONEY, MANTZ, and HAYS, JJ., concur.

SMITH, C. J., concurs in result.