MARIAN S. DEAN, appellee, v. HENRY L. DEAN, appellant.

No. 48347.

(Reported in 60 N.W.2d 551)

OCTOBER 20, 1953.

 Messer, Hamilton & Cahill and Pauline M. Kelley, all of Iowa City, for appellant.

 W. F. Morrison, of Iowa City, for appellee.

BLISS, J.—There is no material controversy between the parties over the applicable law. The principles of law involved have been settled by many decisions of this court. The facts are determinative of the appeal.

Plaintiff was born November 11, 1913, in Des Moines. After graduation from Roosevelt High School there in 1931, she attended Cummings School of Art in that city for three years, and majored in Art for an additional year at the State University of Iowa. Later she specialized in textile designing in New York City. After a childless first marriage, which terminated in thirteen months, she and defendant were married in Iowa City, April 16, 1938. He was about thirty years old at the time and was a graduate assistant in the Department of Botany of the State University of Iowa, which position he held until 1946, when he became a full member of the staff in that department and became an associate professor in 1948, and was such at the trial on the application.

The only child of the marriage, Pamela Ann Dean, involved herein, was born to plaintiff at Mercy Hospital, Iowa City, May 28, 1944. Plaintiff had a nervous breakdown the day after Pamela's birth. There is nothing further shown in the record with respect to the marital relations of the parties except as alleged in the petition for divorce and in the divorce decree. This petition, filed July 19, 1945, alleged the residence of the parties, as husband and wife, continuously in Iowa City for over seven years, and until July 9, 1945. The grounds of divorce alleged in the petition were: "That defendant, in violation of his marriage vows and without any fault of the plaintiff, has for some time last past become exceedingly offensive in his treatment of plaintiff, has absented himself from home a greater part of the time, is continually nagging at plaintiff until she has been driven, practically, to distraction, and she has now a very nervous disposition; that said continual offensive and inhuman treatment of said defendant has caused plaintiff to become sick in mind and body and a continuation of such treatment will completely destroy this plaintiff's health * * * and endanger her life; that plaintiff's health is almost completely broken and she is now a complete nervous wreck * * *." The prayer was for complete

divorce, suitable alimony and support money and the care and custody of Pamela.

The defendant filed no answer and made no other appearance in court to the petition, in person or by attorney or by any other filing. The decree of the divorce court, Honorable H. D. Evans presiding as judge, filed September 5, 1945, after stating the hearing of the cause on August 20, 1945, the appearance of plaintiff's attorney, the lack of appearance for defendant, further "expressly finds and adjudges that said defendant has been duly and legally served with sufficient original notice with copy of petition attached as shown by his endorsement, dated the 17th day of July, 1945 * * *." Absolute divorce was granted the plaintiff, with custody and control of Pamela, and defendant was decreed to pay to the plaintiff $100 per month until Pamela reached the age of sixteen years and thereafter pay plaintiff $50 a month so long as she remained unmarried, and in the event of plaintiff's remarriage prior to Pamela's attaining the age of sixteen years defendant was required to pay plaintiff $50 for the use and benefit of Pamela.

After the divorce plaintiff prepared herself for secretarial work by a year's instruction at the Iowa City Commercial College, and at once was employed as secretary for an advertising company for three months, and then was clinical secretary for a number of doctors in the Department of Internal Medicine of the University General Hospital for six weeks. The work was too strenuous for her physical strength. She stayed at home with Pamela for four months, and then worked for the Delta Chi National Fraternity as a bookkeeper for eight months. Thinking that a change of surroundings and climate might be beneficial, she and Pamela went to California in late 1947, and after visiting with friends for a short time she was employed by a wholesale jewelry company in Los Angeles for over a year. She started at $180 a month and received an increase after a month of $5 a month. She received other increases thereafter. She was in California about eighteen months. During this period she and Pamela lived in a very nice nursery home, with a house manager, house mother, and shifts of registered nurses. The nurseries for the children were downstairs and the mothers had

rooms upstairs. The care of Pamela and the mother's room cost $126 a month. Plaintiff bought all of her meals elsewhere and took Pamela out on Sundays.

Plaintiff worked beyond her strength during the inventory period, and because of the nervous strain some of her fellow employees advised her to see a psychiatrist who had attended them under like circumstances. She did so, and without losing any time from her work she took the "shock treatment" from him. She had eight of the electric shocks—two a week for a month—and the calcium shocks for six months. Later she quit work for the jewelry company and was employed by a law firm as secretary until she decided to go back east.

Plaintiff's brother was to get his Degree of Ph.D. at Columbia University in April 1949, and she planned to leave California to be near him. She and Pamela came to her uncle's home in Des Moines on January 6, 1949, and remained there until May 4, 1949, when they went to Rochester, New York, where her brother was then employed by the Eastman Kodak Company. She was employed at Rochester by an orthopedic doctor and another for four months, but, being unable to get satisfactory care for Pamela, in September 1949 she returned to her uncle's home in Des Moines for a short time, and then moved into housekeeping rooms at Thirty-first and University in October 1949. She remained there until March 1, 1950, and then furnished a third-floor apartment—one large room with a dinette alcove, a large kitchen, bath, and ample closet space—for which she paid $55 a month with utilities furnished. She and Pamela remained there until August 28, 1952. Plaintiff began working for the State Auto Insurance Company in Des Moines in December 1949 and was employed there until January 1952. She quit this work, on her doctor's advice, to reduce her hours of work. She then worked in the law office of Owen Cunningham, who had been in the Government service, until he was caught up on his work and had no further need for her. She then worked for an architect until about August 1, 1952. While employed by the Auto Insurance Company she had a full secretarial position and also did verityping—a form of printing. The company did business from Iowa to the west coast. Her wages

were $38 a week at the start and were increased after three months by $9 a month. The company also had a bonus system. When she first began housekeeping in Des Moines plaintiff put Pamela in Byram's Nursery Home for eight months. Thereafter, for about two years, plaintiff employed two different neighbors, who had children, to look after Pamela before and after school. Pamela attended the public schools in Des Moines. Her grades were twenty-one "satisfactory", nine "improving but not satisfactory", and one "unsatisfactory"—which was keeping hands and objects away from her mouth.

Plaintiff's work hours with the insurance company were from 7:45 in the morning until 4:30 p.m. When she returned home after work she would get Pamela from the neighbor lady and take her home and have her with her until after breakfast when she would go to the neighbor lady a half block away until schooltime.

Plaintiff attended the University Church of Christ and Pamela went with her a few times. Pamela was a member of a private neighborhood Sunday School class, which met, however, on Wednesdays. One of the women in the neighborhood organized it to teach Bible Stories to the children. Plaintiff's sister-in-law—a minister's daughter—sent Pamela a children's Bible, which her mother had been reading to her regularly.

Plaintiff had been working very hard in the summer and the fall of 1951, putting in a good deal of overtime, was run-down as a result of it, and a period of illness developed, starting with the flu and later an attack of appendicitis in November 1951. A jaw infection reoccurred and it was necessary to have four teeth pulled. On the advice of her physician that she should have a complete bed rest she voluntarily went to Broadlawns Hospital in August 1952. Prior to this time, because of the extra expenses incurred, she called upon the executive secretary of Family Service, Travelers Aid, affiliated with the Des Moines Community Chest, for financial aid. She had been sent there by the Red Cross. She received the financial assistance and other aid and advice. The secretary, Miss McCreery, as a witness for defendant, testified that she saw plaintiff four or five times, and "at that time, she just wasn't well, and she needed the help that

our agency gave her in handling the finances and in making plans * * *. She had a great deal to do and wasn't apparently well enough to do it all herself. * * * She was concerned when she knew she was going to the hospital that something would be done with Pam. She tried to contact Mr. Dean, but he could not be reached at that time. He was out of Iowa City. I did not try to get in touch with him. She was concerned about what arrangements were going to be made for the care of Pam while she was in the hospital, and she was making arrangements for her care. * * * She made the final arrangements" for her care at the Children's Home.

Plaintiff was in Broadlawns Hospital ten days. She testified that the psychiatrist "gave me a very quick check and suggested that I might come up here [Iowa City] to the State Psychopathic Hospital for possible treatment. He said he thought psychotherapy might help, but he didn't know whether they would suggest hospitalization or out-patient treatment, or whether they would consider any treatment at all necessary. I was in complete agreement as to having the checkup. I had been planning on moving to Iowa City for a long time and I decided on the State University Psychopathic Hospital partly because of that. I took care of the arrangements myself. I came here by myself. I made arrangements at the courthouse in Des Moines and filled out all the necessary papers. I came here on the Rocket the morning of September 17th, and entered the hospital as a voluntary patient. Before I went to Broadlawns Hospital I made arrangements to have Pamela put in the Des Moines Children's Home. Miss McCreery * * * recommended it. My doctor recommended the same place and the minister at the University Church of Christ [Des Moines] recommended it."

Plaintiff and Pamela made a preliminary visit to the Home. The lady in charge testified: "I think she wanted to decide if it was a proper place and whether her daughter would be happy there. She seemed to be well satisfied. Pamela seemed to be very happy in the Home." The Home is an old-established private institution, charitably supported. Pamela was admitted August 29, 1952. She attended public school at the Bird School right across the street from the Home. She also attended Sunday

School while at the Home. Plaintiff, during the time after her discharge from Broadlawns and her departure for Iowa City, visited Pamela at the Home a number of times, and once took her out of the Home over the week end. She testified: "I wrote my former husband when it was first suggested that I might come here for treatment, explaining that I was coming for a checkup and asking if he would be interested in having Pamela as a visitor for the duration of my hospitalization. I wasn't certain at that time that I would be in the hospital." The date of this letter to defendant does not more definitely appear, except that defendant testified it was written to him when plaintiff was in Broadlawns Hospital. It was probably forwarded to him after her unsuccessful attempt to contact him.

Defendant answered from Lake George, Minnesota, where he and his wife were vacationing, by letter dated September 12, 1952. After some other comments, he wrote: "Would like to take Pam but think I better not the way we both [he and his wife] will be working nights from now on. We go full blast right from the day we get back until the time we leave again. That means we won't be home much at night and with the book coming up I have to put in more time than ever. It will be better not to count on having her since we could not be with her much and she would be alone too much in a strange place." He advised her against coming to Iowa City because it was a more expensive place to live in than Des Moines. Three times in the letter he expressed this idea, to wit, "I don't see why you think Iowa City is better than Des Moines though. * * * I still think you would be better fixed all the way around to stay in Des Moines. * * * Still think it would be wiser for you to stay in D.M. until you get all straightened out." He closed the letter thus: "Tell Pam hello for me when you see her. * * * Would like to see the little monkey sometime, but don't know when I can get away. Will see how things go * * *."

The presence of Pamela in Iowa City would afford defendant more frequent opportunities to see Pamela.

Defendant and wife returned to Iowa City from their vacation about September 20, 1952. On October 18, 1952, defendant called at the Des Moines Children's Home to see Pamela. Of the

Home he testified: "It was a very fine place. It was clean, comfortable, nothing luxurious, but the atmosphere was very good; the children were all happy. * * * She was in good care at the Children's Home, well taken care of."

The present Mrs. Dean first saw Pamela on November 7, 1952, when Pamela was brought to the Psychopathic Hospital at Iowa City. Very shortly thereafter she and her husband had her with them in Des Moines one Saturday night and Sunday, until she was returned to the Children's Home.

On November 15, 1952, defendant filed his application for modification of the divorce decree, alleging that plaintiff was then in the Psychopathic Hospital at Iowa City, *"having been brought to said hospital from her home in Des Moines, Iowa, on or about September 17, 1952;* and that for several years prior to her becoming a patient in said hospital the plaintiff has been bothered with nervous trouble and was very unsettled in her actions, behavior and *mental condition. * * *."* (Italics ours.) There was no notice of the filing of the application or of the hearing given to plaintiff. On the same day the court, Judge H. D. Evans presiding, made an order reciting the defendant's appearance by his present attorneys, with no appearance for plaintiff, and finding that it would be to the best interest of Pamela to place her in the temporary custody of defendant while her mother was a patient in the Psychopathic Hospital and pending future hearing on the application; an order was made accordingly, which further provided that "if plaintiff is dismissed from the Psychopathic Hospital and if the defendant fails to obtain an order setting the said application * * * for hearing * * * without delay, he shall return said Pamela Ann Dean to the custody of the plaintiff * * *."

On November 18, 1952, defendant brought Pamela from the Children's Home to his home. On December 11, 1952, plaintiff filed application by her present attorney for the custody of Pamela, alleging plaintiff's discharge from the Psychopathic Hospital on November 30, 1952, her residence at 811 East College Street, Apt. C, in Iowa City, Iowa; that she obtained part-time work as secretary at the State University of Iowa; that she was well, both mentally and physically; that defendant's application

had not been made within a reasonable time as ordered by the court; and that the order granting the custody to defendant was improperly made without notice of the application or hearing.

On December 13, 1952, defendant filed resistance to plaintiff's application of December 11, 1952, for custody of the child, in which he admitted that no notice was served on plaintiff, but denied that the court's order was improperly made; he alleged the necessity of taking the depositions of two doctors in Des Moines, and for that reason the hearing should not be set prior to January 5, 1953. These depositions were not taken. On the same day defendant filed application for a mental examination of plaintiff. On December 13, 1952, the court made an order setting the application for modification of the decree for hearing on January 5, 1953, and on the same day plaintiff's counsel, in order to save the time of a mental examination, agreed to waive the privilege and consented that defendant's counsel might examine the records in the Psychopathic Hospital respecting plaintiff, and further agreed "to permit the attending psychiatrist to furnish any information he might have pertaining to examination of the plaintiff during the fall of 1952."

On December 13, 1952, Pamela was returned to the home and the custody of her mother by the defendant.

On December 26, 1952, defendant amended his application for modification by amplifying it somewhat. On January 5, 1953, plaintiff filed application for an increase in the amount of money to be paid by defendant to plaintiff, as provided in the decree of divorce, from $100 to $200 a month and also for fees for her attorney. Defendant filed a resistance to this application on January 7, 1953.

The hearing came before the court with Judge H. D. Evans presiding on January 5, 1953. At that time plaintiff was living in a furnished one and one-half room apartment, with kitchen, living room and private bath, at 811 East College Street in Iowa City, which she had occupied since December 1, 1952. She paid for the electricity and $42.50 monthly rental. The wife of the owner of the apartment building conducted a preschool, in the building, for children from two to five years old. The wife formerly was a kindergarten teacher and was assisted by an-

other lady, with a college education, and a registered nurse. Pamela attended the public school near by, and after school she was with her mother or mingled with the children in the preschool. Plaintiff, at the time of the trial, was employed in the Department of Psychology at the University as a part-time secretary for Dr. Don Lewis, with hours from 9 to 12 in the forenoon five days a week, and from 1 to 3:30 in the afternoon on Tuesday and Thursday. She began working for Doctor Lewis a week after she left the hospital on November 30, 1952. Her monthly pay was $92.50.

The owner of the apartment testified that he had observed the plaintiff and Pamela in the apartment, and Pamela in the preschool, and she seemed perfectly happy and contented to be with her mother.

Plaintiff testified: "As far as I know now, I am in perfect health. I feel good. I am not nervous in particular, although this case tends to make me nervous * * *. I am desirous of keeping the custody of Pamela. I feel I can give her the love that only a mother can give a child, and can properly clothe, feed, educate and house her. I have done that in the past, and I feel there is nothing in my condition that I have suffered in the past or may suffer in the future that would tend to make me a poor mother or prevent me from caring for her and doing everything that a normal mother would do. I have taken her to church and I intend to do so in the future. I incurred some bills during my illness and find it difficult to get along with the present money I am receiving. With additional money, I feel I could make it in good shape and give Pamela things that possibly she should have."

In a proceeding of this kind there are two matters to be established. The burden is on the party seeking the modification of the divorce decree, or other order, to establish these essentials, the first of which is, that the circumstances and conditions surrounding the parties at the time of the original decree or order have substantially changed in material respects, favorable to the applicant for modification. The second essential is, that because of this change it is to the best interest of the child that the modification prayed for be granted.

The district court found that the applicant-defendant had failed to establish either essential.

It appears from the evidence that at the time of the divorce in September 1945 the parties were living in a rented duplex apartment. Plaintiff had no property. Her health was impaired, her nerves distraught, and she was worried—all of which she charged to defendant's improper conduct. Defendant was employed and capable of earning a good living. After the divorce he lived in a one-room apartment with bath and tiny kitchenette, which bachelor quarters he occupied until June 10, 1949, when he married Lillia Stromsten, who had been widowed by her husband's death. She was childless, and has had no children by defendant. She owned a small home, not pretentious, but comfortable, into which defendant moved on his marriage, and he and his wife have occupied it ever since.

Mrs. Stromsten was operating a small photograph gallery when she married defendant, which she has continued to operate, with some help. She is at the studio from 10:30 in the forenoon until 3 in the afternoon. She testified that she would sell the studio if the court advised. The income of the studio in 1951 was a little over $700 and would be about the same in 1952. Whether this was gross or net income does not appear.

In 1945 defendant's salary was a little over $3000; in 1946 it was $3075; in 1947 his gross salary was $3740.40, and after deductions it was $3337; in 1948 his gross salary was $4444.74, and after deductions was $4010.64. His gross salary in 1949 was $4781.57; in 1950 it was $5233.33; in 1951 $5233.34, and in 1952 it was $5400. During these years he testified the average total deductions each month were from $130 to $140. These salary increases were largely cost-of-living raises received by the whole staff. There is no evidence that defendant has any other property or income.

Defendant was a witness in his own behalf, as was his wife. Their testimony strongly favored defendant's cause. Doubts were resolved in his favor. Of a visit to see Pamela in Des Moines, defendant testified: "She seemed to be in good health. I couldn't tell if she was happy because I was of the impression she was glad to see me. I couldn't tell whether she was happy

otherwise or not." When Pamela was returned to the plaintiff on December 13, 1952, two ladies were present in defendant's home—apparently preparatory to being witnesses for defendant, which they were—when Pamela was told she was to go back to her mother. They also accompanied defendant and his wife when Pamela was returned. There was testimony that Pamela cried some when she was told. But there was also testimony that when plaintiff met them at the door of her apartment, Pamela cried out, "Mommy", and plaintiff, "Pammy", as they went into each other's arms for a long embrace. One of these ladies thought Pamela "did not clasp her mother as closely as her mother clasped her." Mrs. Dean testified that Pamela "finally pulled away" and said that she wished to stay "with Lillia and daddy." Another witness and his wife testified that the Deans were a congenial couple and had a pleasant home. They had not visited the Deans while Pamela was with them. Two other witnesses gave similar testimony. On the only occasion when one of them was in the Dean home when Pamela was there she observed the affection Pamela indicated for Mr. Dean and Mrs. Dean. A young lady who was employed next door to Mrs. Dean's photograph studio and observed Pamela, when the receptionist in the studio or defendant brought Pamela there from school, gave like testimony. Miss McCreery, executive secretary of Family Service, mentioned above, who, it does not appear ever saw Pamela, was asked her opinion whether it would be conducive to the welfare of the child to be left during adolescence with her mother. Her answer was: "Here, I am afraid that we have to think that if Pamela were to remain with her mother, she would do one of two things. She would become eventually as she got older, antagonistic and resentful and be unwilling to take guidance from her mother." She did not state any foundational facts for the opinion nor did she state the other horn of the anticipated dilemma. The lady in charge of the Children's Home, who had brought Pamela to the Psychopathic Hospital, on the recommendation of the doctor in personal attendance on plaintiff, and of the General Staff of the hospital, for examination, was also a witness for defendant. She testified that Pamela was happy

in the Home, and did not cry when her mother left her after visits at the Home.

Defendant relies much upon the testimony of a 28-year-old doctor—a resident in psychiatry in the Psychopathic Hospital for one year. Plaintiff was his patient while she was in this hospital, although he discussed her condition in several conferences of the general staff, which agreed with his conclusions. None of the staff were witnesses. He testified: "The diagnosis in psychiatric nomenclature is 'paranoid condition'. I estimate the duration, by the history obtained from her, and it seemed that this process has been going on about eight years. * * * It is perhaps what might be considered the least severe form of the general illness [paranoia]. It is characterized by hallucinations, delusions, ideas of reference, and a preoccupation with vague bodily complaints. * * * The hallucinations were always auditory. Another one of the characteristics of her condition is distorting realities. * * * Her thinking process was always intact, but it took its point of departure from the original distortion contained in the delusion. She was litigious, argumentative, contentious. * * * With reference to her being litigious we had some difficulty with her, with reference to handling of her petty cash. Because she was a patient in the hospital many of her financial affairs had to be cared for by a social worker or the business office. She felt that her funds were not being handled to her best advantage or according to her wishes, and on several occasions she became extremely upset and even threatening, and demanding an accounting of her funds * * *." It appears that it was something more than "petty cash", as defendant had sent her alimony payments both to Miss Mc-Creery and later to the business office of the Psychopathic Hospital.

Continuing, the doctor testified: "The paranoid condition of which I speak is one not easily discernible by the ordinary layman. It takes a competent psychiatrist who can observe an individual over a long period of time * * *. This condition is not a dangerous type of paranoia insofar as doing physical harm to an individual is concerned. It will not ordinarily become worse to the extent that it might be physically dangerous to

individuals associated with her. * * * I might say that it is not malevolent. * * * This paranoid condition which Marian Dean had is not dangerous, physically, to herself or to anyone else. With this type of paranoia I know of no possibility of a cure. One who has that type may go through life remaining in that condition. It is quite characteristic. There are a number of people in the world with that type of paranoid condition and not committed to an institution. It would pass among the laity as a nervous disorder." It will not be seriously contended, we believe, that the "laity" have very greatly predominated among the people of the earth in all times and that the extraordinary progress of the human race has been enormously advanced in all ways and in all purposes by the manifold abilities, including keen and accurate discernment, of that great class. It is undisputed that plaintiff successfully completed educational courses beyond that of the average individual; that she performed services for professional men of various kinds, for large business concerns, and for departments of the State University of Iowa, for several years, though burdened with the care of Pamela since her infancy: She received advancements in her employment and increases in her pay. There is no evidence that any of her employers discerned any subnormal tendencies in her mentality or her conduct.

Although the doctor-witness testified of her becoming extremely upset over her "petty cash", he thought the taking of her child from her would not affect her mental illness, and "would be injurious only in the sense that she would react to such an adversity as anyone else. It is possible that during the grief and frustration she would suffer physical repercussions." In other words, we take it that she would be affected just as any other mother of normal mentality would be affected under like circumstances.

Pamela was in the clinic at the Psychopathic Hospital from ten o'clock in the morning until five o'clock in the afternoon. She was examined by a psychologist, and the doctor-witness spent about two and one-half hours with her "in an effort to determine whether the child had suffered any serious distortions of emotional development as a result of living with her mother." He

testified: "In view of the rather serious mental condition of the mother, the child was found to be a remarkably well-adjusted child. However, some rather intensive psychological studies did bring forth certain ominous trends in the child's personality which were felt to be related to the emotional environment. All of these findings indicate that this child enters into personal relationships on a rather superficial level. She does not appear to be able to mobilize much effectivity toward people, and her description of familiar interrelationships is almost without feeling. From the results one may predict that the child's subsequent development will remain essentially the same unless some changes are effected in her environment. If she does not receive gratification for her needs and cannot identify with stable masculine and feminine figures on a less involved and precocious level, it seems likely that she will become even more aloof and will not be able to form meaningful and satisfactory relationships with people."

On examination by the court the witness testified: "I would say the plaintiff is capable of taking care of herself outside the hospital. Ordinarily, there is no likelihood that she would have any spells that she would injure somebody. Insofar as taking care of others is concerned, I feel that her adjustment is always marginal and very precarious, so that whenever the illness becomes particularly acute she will fall behind and might neglect some part of her duties towards others. I stated that the little girl is in good condition at the present time. * * * When I examined her there were no obvious character disorders which I could attribute to the adverse effect of living with her mother.

"Question by the court: I believe you said something to the effect that she might suffer distortion of character if she continued to live with her mother? Answer: Yes. I would only say might, but I predict that she would."

There is no evidence in the record that Pamela has suffered either mentally or physically while in the custody and under the care of her mother. The defendant does not contend otherwise. His wife testified: "I will agree that she is quite an intelligent little girl. I think in some ways she is in advance

of her age. * * * She is in the third grade in school. The teachers stated that she was adjusting very well, doing satisfactory work and that she seemed very happy in school. When we take the child out in public she is polite and courteous. She doesn't make a nuisance of herself among her elders." Pamela was in defendant's home only from November 18 until December 13. The healthy condition of Pamela in body, mind and conduct must be credited to her mother. She has carried almost the full burden of her care and has battled bravely under difficulties to do so. The defendant has not been delinquent in the payments decreed by the court and has paid more than those sums. This is to his credit, but it is only as it should be. He is under moral and legal obligations to provide for his child. When the mother in her illness and straitened circumstances asked him to take temporary care and custody of Pamela he failed both her and Pamela. He and his wife were too busy with other matters, and Pamela "would be alone too much in a strange place." Conditions have not changed much in either respect.

The court has neither the right nor the inclination to punish or reward either parent in matters of this kind. The paramount and controlling consideration of the court is the welfare and best interests of the child, present and future. This court has so held so many times that extensive citation of decisions is unnecessary. All courts uniformly so hold. Herr v. Lazor, 238 Iowa 518, 525-529, 28 N.W.2d 11; Freese v. Freese, 237 Iowa 451, 458-461, 22 N.W.2d 242; Jensen v. Jensen, 237 Iowa 1323, 1324, 1325, 25 N.W.2d 316; Ellison v. Platts, 226 Iowa 1211, 1215, 286 N.W. 413; Wiggins v. Wiggins, 239 Iowa 1279, 1296, 1297, 34 N.W.2d 607; Shepard v. Gerholdt, 244 Iowa 1343, 60 N.W.2d 547; Dow v. Dow, 240 Iowa 145, 150-153, 35 N.W.2d 853. Many supporting authorities are cited in these opinions.

The parties through their attorneys agreed that the trial court might interview Pamela. This the court did and stated in its ruling: "The court did on January 24, 1953, have a long interview with Pamela alone, and also with the plaintiff." This statement may be open to two constructions, one that he inter-

viewed Pamela and also her mother—as contended by the defendant—or that the court had two interviews with Pamela, one a long one with her alone, and another with Pamela in the presence of her mother, and also some conversation with the mother, since she disclosed her desire and intention to live in Iowa City. But, whichever construction is accepted, we are not convinced that the mother, as contended in defendant's printed argument, so "poisoned" the court's mind that its ruling should be reversed.

The court further stated:

"It was very apparent to the court, and the court finds that it is the desire of Pamela to remain and live with her mother, this plaintiff. The little girl is now eight and a half years old and seems very intelligent and shows no signs of having in any way been adversely affected by living with her mother since her birth. The court's interview with the mother disclosed that she prefers to live in Iowa City, that she is anxious to have a permanent home, and that if it is at all possible from a financial standpoint she will remain and establish a permanent home in Iowa City for herself and Pamela; that she has no desire to be moving from place to place, and that her prior actions in this regard were brought about by necessity.

"The court does not find that the plaintiff is an unfit mother in any way. The court is of the opinion that plaintiff can * * * establish and maintain a permanent home for Pamela and can rear her in a proper and suitable manner, and that the little girl will not suffer distortion of character by living with plaintiff in the future. * * * From the evidence offered in this hearing, from the record and testimony in the original divorce case of which this court takes notice, and from the information gathered during the respective interviews with the little girl and the plaintiff, the court is of the opinion and finds that the best interests of Pamela Ann will be served by her remaining with plaintiff, and that the claims made and evidence introduced by defendant are insufficient to warrant the court in changing or modifying the provisions of the original decree as to custody. The application of defendant to modify such decree is therefore

denied and dismissed. The court does, however, reserve jurisdiction and retains the right to modify such decree as to custody if and when it is deemed necessary for the welfare of the little girl."

It is to be kept in mind that Pamela is a ward of the District Court of Johnson County, Iowa, with rights with respect to her superior to those of either party. Helton v. Crawley, 241 Iowa 296, 317 et seq., 41 N.W.2d 60.

The controversy between the parties is triable de novo in this court, and we have reviewed it anew on the law and the facts, considering only those matters properly before us, but giving such weight to the findings of the trial court as they are entitled, since it was in a better position than this court to weigh the testimony. Blundi v. Blundi, 243 Iowa 1219, 1226, 55 N.W.2d 239; Jensen v. Jensen, supra, 237 Iowa 1323, 1334.

"Of all the questions with which a court of justice is required to deal, that of the custody of [minor] children is the most difficult." Ex parte Agnello, 72 N. Y. S.2d 186, 191; In re Krauthoff, 191 Mo. App. 149, 151, 177 S.W. 1112, 1113; Helton v. Crawley, supra, 241 Iowa 296, 328.

We have carefully studied the record and earnestly appraised the testimony. It is our considered conclusion the welfare and best interests of Pamela require that she remain in the care and custody of her natural mother. Speaking of children in a like situation, Justice Brewer of the Kansas court, and later of the United States Supreme Court, in In re Bort, 25 Kan. 308, 311, 37 Am. Rep. 255, 258, said: "They are of that tender age when they need a mother's care. No stranger, however kind, can fill her place. We may not ignore these universal laws of our nature, and they compel us to place these children where they will be within the reach of a mother's love and care." And in Wood v. Wood, 220 Iowa 441, 446, 262 N.W. 773, 775, this court said: "The court will take judicial notice of the fact that children of the age of those involved herein are greatly in need of a mother's sympathy and affection and in need of the tender care and consideration which only a mother can give, and that there is no satisfactory substitute for a mother's love."

The trial court denied the plaintiff's application for additional alimony and fees for her attorney.

The ruling, judgment and decree of the district court is— Affirmed.

OLIVER, WENNERSTRUM, GARFIELD, SMITH, MULRONEY, and LARSON, JJ., concur.

CHIEF JUSTICE HAYS and THOMPSON, J., dissent.