LAVERNA KAY THEIN, by her mother, Lorrayne C. Thein, natural guardian and next friend, appellee, v. HAROLD SQUIRES et ux., appellants.

CHARLES L. THEIN, by his mother, Lorrayne C. Thein, natural guardian and next friend, appellee, v. BEN HUEBBE et ux., appellants.

No. 49713.

(Reported in 97 N.W.2d 156)

Jᴜɴᴇ 9, 1959.

Rᴇʜᴇᴀʀɪɴɢ Dᴇɴɪᴇᴅ Jᴜʟʏ 24, 1959

Swift & Swift, of Manchester, for appellants.

O'Brien & O'Brien, of Oelwein, for appellee.

Gᴀʀғɪᴇʟᴅ, J.—Plaintiff, divorced mother of a girl and boy, filed applications in equity against two married couples with whom the children lived the preceding five years asking modification of decrees in habeas corpus denying plaintiff's claim to their custody and granting it to defendants. The applications were consolidated and tried to the court in May 1958. From judgment in August as prayed defendants appeal.

Plaintiff, 39 at the time of trial, and LaVern Thein are parents of the children in question, a girl, LaVerna Kay, born June 22, 1949, and a boy, Charles, born September 10, 1951. In

August 1953 the husband was granted an uncontested divorce from plaintiff and awarded custody of the children. However, he had placed the little girl with defendants Mr. and Mrs. Harold Squires in March 1953 and the little boy with defendants Mr. and Mrs. Ben Huebbe in June of that year. When they were so placed Charles was about a year and nine months old and LaVerna Kay about three years, nine months. The children have lived in the respective homes of defendants since they were taken there—about six years in all. In argument here it was agreed there had been no change in their custody up to then.

Mrs. Squires is a sister of LaVern, father of the children. The Squires live on a rented 160-acre farm about 18 miles from Oelwein where plaintiff lives with her mother. The Huebbes live in Cedar Rapids where Mr. Huebbe has worked for Penick & Ford, a large concern, since 1946. No other children live in either home. Mr. and Mrs. Squires were respectively, 37 and 35, Mr. and Mrs. Huebbe 45 and 43 at time of trial.

March 30, 1955, the divorce decree was modified by changing the custody of the children from their father to their mother (plaintiff here). However defendants, with whom the children lived, were not parties to this proceeding and of course were not concluded by it. April 8, 1955, plaintiff brought two actions in habeas corpus against the Squires and Huebbes respectively, seeking custody of the children. These actions were consolidated and tried in May.

May 27 decrees were entered therein finding it was for the best interests of the children that they remain in the homes of defendants, denying plaintiff's claim to custody and granting it to defendants, subject to plaintiff's right to take each child for a week end of two days not oftener than every three months. Jurisdiction was reserved to make such further orders as the welfare of either child "shall dictate." The present applications to modify the decrees of May 27, 1955, by awarding custody to plaintiff, were filed April 24, 1958.

At the outset it was stipulated the decrees of May 1955 are an adjudication defendants were then better fitted than plaintiff to have custody of the children, the hearing on the applications shall be concerned solely with matters arising since May 1955 but the court may consider evidence then heard for what-

ever bearing it may have upon the character and fitness of the parties to have custody of the children.

After hearing evidence for and against the applications for modification of the 1955 decrees the trial court concluded the children's welfare will be best served by placing them with plaintiff to whom their custody was granted, subject to the privilege of defendants respectively, to have the respective children during two months each summer. It is this judgment from which defendants have appealed.

Our review is de novo. Stevenson v. McMillan, 250 Iowa 737, 740, 95 N.W.2d 719, 721, and citations; In re Guardianship of Plucar, 247 Iowa 394, 396, 397, 72 N.W.2d 455, 457. However, we give weight to the trial court's decision.

I. It is admitted that when the 1955 decree was entered and prior thereto plaintiff was an alcoholic, guilty of at least occasional immoral conduct with men. She had been a patient for treatment as an inebriate in the state institution at Independence. Plaintiff testifies she did not use liquor during the summer of 1955 but was unable to resist the urge for four months commencing about September 1. She admits she went to Prairie du Chien, Wisconsin, on Labor Day with her former husband and two other men, became intoxicated, drove an automobile into a ditch and wrecked it. No one speaks well of the former husband and the trial court characterizes him as a thoroughly disreputable character.

Plaintiff also admits that in December 1955 she became intoxicated while with a married man and the two occupied a room for the night in an Oelwein hotel. She also admits use of liquor on other occasions during this period. The first week in January 1956 plaintiff rejoined Alcoholics Anonymous and insists she has not used liquor since then. She is corroborated in this and there is no evidence to the contrary. Plaintiff had belonged to AA about nine months commencing in 1954. Since rejoining the organization she has regularly attended its meetings. She and her mother have also been regular attendants at their church during this time of nearly two and one-half years.

As the trial court observed in his findings, plaintiff's applications to modify the 1955 decree are based upon her claim

that since the end of 1955 she has completely rehabilitated herself. However, some fault is found with defendants' care and treatment of the children and conditions under which they live, particularly as to the Huebbes.

Since the 1955 decree plaintiff sold cosmetics eight months. She then clerked in a variety store in Oelwein where she was working at the time of trial. She gets along well with her co-workers and customers. Her earnings are as much as $65 a week, her hours from 9 to 5. She and her mother, 60, occupy the latter's home of four rooms (two bedrooms), bath and inclosed porch. The mother has income of $175 a month and would like the children to come there to live. Plaintiff has taken each child two days every three months, as permitted by the 1955 decree, except once when her father died.

The Catholic priest at Oelwein testifies plaintiff has lived an exemplary life and attended church regularly since 1955 and is a fit and moral person to have the children, the mother's home—adjoining the church property—is clean and fit for the children and her reputation is above reproach. The chief of police says he has heard of no misconduct of plaintiff since 1955, she has done a wonderful job of rehabilitating herself and gaining respect of others, and he thinks she is a fit and proper person to have the children. A woman friend of plaintiff and her mother, who is with them frequently, and another clerk in the variety store each gives her opinion plaintiff is fit and proper to have the children.

A member of Alcoholics Anonymous testifies he thinks plaintiff is morally responsible and would handle responsibility of the children well if awarded their custody. On cross-examination this witness says it happens quite often that a member of AA for two years or longer falls again and becomes intoxicated, his belief is that once an alcoholic always one and belonging to the organization two years is not real evidence they will not fall again.

The foregoing, although of course condensed, fairly indicates the showing for plaintiff as to her rehabilitation.

II. Principal complaint of consequence against Mr. or Mrs. Squires is that the latter does not permit the little girl to visit with, or show affection for, her mother when they occa-

sionally meet. It is not claimed plaintiff's visitation rights under the decree have been denied. It must be conceded, however, this criticism of Mrs. Squires is justified. Complaint is also made that the little girl was asked to and did share her bed with her father's present wife at least once or perhaps oftener.

It is undisputed that the Squires home, a 9-room farmhouse, is clean and orderly. LaVerna Kay has an upstairs room of her own, nicely furnished. Several witnesses characterize Mr. and Mrs. Squires as industrious, sober, law-abiding and responsible. It is admitted the little girl is always clean, neat and well dressed. She has regularly attended the public school four years and gets "B" grades. She attended a Baptist Sunday school regularly for the year before the trial and irregularly before then. In the summer she attends Bible school. The Squires seem to be kind to her and she is happy and contented.

III. Regarding the boy, plaintiff, her mother and their friend Mrs. Wade testify he was not clean when plaintiff took him from the Huebbe home for the quarterly week-end visits. Particular complaint is made of his ears and fingernails, also his underwear unless it was new. Plaintiff and Mrs. Wade also say the Huebbe home was untidy and not clean. Condition of the windows and floor is specially criticized. Once, when it is claimed the floor was dirty, workmen were there remodeling the house.

There is some evidence of drinking by Mr. Huebbe and that on one occasion there was a bottle on the kitchen table at which Huebbe and another man were seated. Plaintiff says the Huebbes usually had a bottle of wine in their refrigerator and she had a drink of wine with Huebbe about seven years ago. The Huebbes and the man who says he was seated at the table strenuously deny their use of liquor. Several close acquaintances say they never saw Mr. or Mrs. Huebbe drink. The printed record at page 87, line 27, contains this misstatement: "I have seen the Huebbes drink intoxicating liquor." The transcript of the evidence, certified to us pursuant to rule 341, R. C. P., shows the true record is, "I have never seen the Huebbes drink * * *." The trial court found "Neither Mr. or Mrs. Huebbe drinks to any excess."

Mrs. Huebbe has a "heart condition" for which she takes medicine. The court found "She does not appear unduly handicapped and has not consulted a physician for several years." Mr. Huebbe had a kidney infection and was off work at Penick & Ford from November 14, 1957, to January 20, 1958.

Plaintiff and Mrs. Wade testify they saw Mr. Huebbe on one occasion shake his fist at Charles and call him a vile name. Huebbe denies this and Mrs. Huebbe and some close acquaintances say they never observed anything of the kind. Mr. Huebbe was convicted of a felony, attempt to break and enter, and served time in the reformatory at Anamosa in 1936 and 1937. He owes $800 on his home and about $1700 aside from that. He has a cabin on the Cedar River which he values at about $700 or $800 and a boat. His cabin, furniture, automobile and television set are mortgaged. He earns $4800 to $5000 a year and, as stated, has worked for the same employer since 1946.

The four defendants are church members but do not attend church. Charles had not attended Sunday school at the time of trial but Mr. Huebbe testifies he is ready and willing to send him "since he is old enough now that he can grasp it." (His age was then six years, eight months.) Charles had attended kindergarten and was to enter the first grade of a public school the September after the trial.

The above sufficiently indicates the evidence that is derogatory to the Huebbes. Both of them and four close acquaintances say Charles and his clothes were kept clean except when he was playing in the dirt, the home was not dirty and was as clean, or cleaner than, the average home. One witness states Mrs. Huebbe is not a slave to her home, another that she is not a fanatic as a housekeeper. The home has four rooms and bath, with two bedrooms. Charles sleeps in his own bed in the room with Mr. Huebbe. The boy is healthy and robust. He is happy in the Huebbe home and the trial court so found. The Huebbes are attached to the boy and anxious to keep and rear him. Mr. Huebbe, when he can, plays with Charles outdoors. Witnesses for the Huebbes say theirs is a good home for the boy and they are fit persons to have him.

Both the Squires and Huebbes bore the entire expense, without reimbursement, of keeping the children respectively,

during the approximately five years before the trial when they were in defendants' custody.

At the conclusion of the evidence the trial court, by agreement of counsel, talked privately to each child. According to the court "they expressed an affection for each other and a desire to be together, as well as an affection for the persons with whom they were now living. They appeared happy and well adjusted."

Although the court felt the children's welfare will be best served by placing them with plaintiff, his conclusions of law state, "defendants deserve the thanks of plaintiff and commendation of the court for the wholehearted manner in which they have devoted themselves to the care of these children, beginning at a time of their greatest need. * * * It is the court's hope * * * the children will continue to enjoy the company and affection of defendants." And, as stated, the decree provides defendants may have the children during two months of each summer.

■ IV. There can be no doubt, as the parties stipulated at the outset, the decrees (we have sometimes referred to "the decree") of May 1955 are an adjudication defendants were then better fitted than plaintiff to have custody of the children. The burden rested upon plaintiff to show that because of what has happened since that time the welfare of the children will be best served by taking them from defendants and placing them with plaintiff. The decrees themselves reserve jurisdiction to make only such further orders as the welfare of either child shall dictate. See in this connection Jensen v. Jensen, 237 Iowa 1323, 1324, 25 N.W.2d 316, 317, and citations; Maron v. Maron, 238 Iowa 587, 592, 28 N.W.2d 17, 19; York v. York, 246 Iowa 132, 135, 67 N.W.2d 28, 30, and citations.

The precedents just cited involve applications to modify custody provisions of decrees of divorce, rather than in habeas corpus. But it seems clear the present case is governed by the same principles, especially in view of the stipulation· at the outset and the terms of the 1955 decrees. See in this connection Werling v. Heggen, 208 Iowa 908, 911, 225 N.W. 952.

As previously explained, plaintiff's applications are based upon her claim she has rehabilitated herself since the end of 1955. It appears she did refrain from use of liquor and im-

moral conduct and otherwise properly demeaned herself during the two and one-third years preceding the trial. The ultimate question is whether it follows from these facts that the welfare of the children will be served by changing their custody from defendants to plaintiff.

There is no evidence defendants did not furnish the children as desirable homes or as good care during the period since the 1955 decrees as they did before then. And during this period, now four years, the children have naturally become more strongly attached to defendants and their homes, and defendants to the children, than they were in May 1955. In other words, while plaintiff was rehabilitating herself the children were becoming more firmly rooted in their present surroundings.

 We have held so often that the primary consideration in cases of this kind is the welfare and best interests of the children that citation of precedents for the proposition is unnecessary. See, however, Ball v. Ball, 250 Iowa 763, 765, 96 N.W.2d 317, 319, and citations; Stevenson v. McMillan, supra, 250 Iowa 737, 740, 95 N.W.2d 719, 721, and citations.

We have also repeatedly held that all other considerations, such as parental rights, must yield readily to that of the best interests of the children. Their welfare is superior to the claim of either parent and the feelings and wishes of the parent are entitled to little, if any, consideration. See precedents last above and citations therein; Maron v. Maron, supra, 238 Iowa 587, 591, 28 N.W.2d 17, 19, and citations. "Nor should the decree be modified to reward or punish either parent." Jensen v. Jensen, supra, 237 Iowa 1323, 1325, 25 N.W.2d 316, 317; Dean v. Dean, 244 Iowa 1297, 1313, 60 N.W.2d 551, 560.

An annotation in 15 A. L. R.2d 432, 435, states: "It is universally recognized by all courts that in fixing the custody of a child considerations of the welfare and interests of the child outweigh all other considerations; * * *."

 Where the right of custody has not been adjudicated it will be presumed, in the absence of evidence to the contrary, that a child's welfare will best be served by committing it to the custody of a parent. This presumption is resorted to merely to aid the court in determining what is for the best interests of the child. But the presumption is not applicable to such a

case as this where the children's custody has been awarded third persons by a decree—here the 1955 decrees. It is to be assumed the court knew and respected the presumption referred to in arriving at these earlier decrees. The presumption here is in favor of the reasonableness of the decrees now sought to be modified. Jensen v. Jensen, supra, 237 Iowa 1323, 1330-33, 25 N.W.2d 316, 320-22, and citations; Maron v. Maron, supra, 238 Iowa 587, 592, 28 N.W.2d 17, 19; Blundi v. Blundi, 243 Iowa 1219, 1225, 55 N.W.2d 239, 243.

■ Commencing with Jensen v. Jensen, supra, down to Stevenson v. McMillan, supra, 250 Iowa 737, 745, 95 N.W.2d 719, 724, we have approved this statement at least six times: "When a child is legally placed in a home where it receives good treatment and moral training, it should never be removed from that home, except for the most cogent reasons." Wiggins v. Wiggins, 239 Iowa 1279, 1297, 34 N.W.2d 607, 616; Scheffers v. Scheffers, 242 Iowa 563, 570, 47 N.W.2d 157, 161; Blundi v. Blundi, supra, 243 Iowa 1219, 1230, 55 N.W.2d 239, 245; York v. York, supra, 246 Iowa 132, 141, 67 N.W.2d 28, 33.

Incidentally, in five of the six precedents just cited (all but Blundi v. Blundi) the trial court was reversed for changing, in favor of a parent, custodial provisions of a previous decree. And in Blundi v. Blundi no change was ordered.

Much the same language as quoted last above is expressed in Durst v. Roach, 245 Iowa 342, 346, 62 N.W.2d 159, 161; Jensen v. Sorenson, 211 Iowa 354, 364, 233 N.W. 717; Knochemus v. King, 193 Iowa 1282, 1285, 188 N.W. 957, 959. Durst v. Roach quotes with approval from Winter v. Winter, 184 Iowa 85, 88, 166 N.W. 274, 275: "It is highly desirable that the status of the child be fixed as quickly as possible, and that it be disturbed thereafter as little as possible."

■ It appears without doubt that when these children were placed with defendants plaintiff was taking an extended vacation from the responsibilities of motherhood and consequently the children were in great need of good homes. They have lived with defendants, as stated, six years up to now. Freese v. Freese, 237 Iowa 451, 460, 22 N.W.2d 242, 247, and Scheffers v. Scheffers, supra, 242 Iowa 563, 571, 47 N.W.2d 157, 161,

approve this statement: "* * * motherhood is something with respect to which it is very difficult to take a holiday; it can be taken only with the incidental formation of new and substituted attachments. To break such cannot be done lightly." See also Dow v. Dow, 240 Iowa 145, 35 N.W.2d 853.

Plaintiff is surely to be commended for mending her ways and it is to her credit that she sought the custody of her children even belatedly. However, we are not persuaded it is for their best interests to transplant them now from the only homes they remember, where they have done so well, have grown healthy and strong, are contented and (as the trial court found) happy and well adjusted, from their friends and playmates, from the schools they have attended, and place them in another home and new surroundings. To do so would be in the nature of an experiment which should not be made upon the showing here. There is no reason to think the children will not be as well cared for by defendants in the future as they have been in the past.

Unless we are to depart from what we have often said in the past, custody of the children should not be taken from defendants and placed with plaintiff as a reward to her for recent conduct which befits a lady.

It is of course true the children have been separated from each other the past six years. But they are no worse off in this respect since the 1955 decrees than they were before. This is a circumstance which has existed without change throughout the six-year period. Nothing has arisen in connection with this fact to warrant modification of these decrees.

As previously explained, the trial court gave defendants the privilege of having the children two months of each summer. We have difficulty in reconciling the court's finding that the welfare of the children will be best served by taking them from defendants and placing them with plaintiff and the provision they may be with defendants one sixth of the time. If it were true the welfare of the children dictates a change of custody to plaintiff, the change should be made without such a provision for divided custody.

We have held several times experience shows it is usually not for the best interests of children, and in many in-

stances is destructive of discipline, to live part time in one household and part time in another. York v. York, supra, 246 Iowa 132, 138, 139, 67 N.W.2d 28, 32, and citations; Maron v. Maron, supra, 238 Iowa 587, 590, 591, 28 N.W.2d 17, 19, and citations. See also Mansfield v. Mansfield, 230 Minn. 574, 42 N.W.2d 315, 316, 317, and citations.

In its broad outlines this case finds its counterpart in a good many that have come before us in recent years where, due to the inability or unwillingness of one or both parents to make a desirable home or provide good care for a young child, it is placed with a third person. After an extended period the parent's situation is changed so he or she can probably provide a good home for the child and its custody is demanded. Almost without exception, with little disagreement among the members of the court, we have held the change in the situation of the parent demanding the child's custody is insufficient basis for disturbing the existing custodial arrangement. In few of our cases have the living arrangements sought to be changed existed for such an extended period as we have here.

Precedents just referred to include Werling v. Heggen, supra, 208 Iowa 908, 225 N.W. 952; Paulson v. Windelow, 236 Iowa 1011, 20 N.W.2d 470; Herr v. Lazor, 238 Iowa 518, 28 N.W.2d 11; Wiggins v. Wiggins, supra, 239 Iowa 1279, 34 N.W.2d 607; Dow v. Dow, supra, 240 Iowa 145, 35 N.W.2d 853; Scheffers v. Scheffers, supra, 242 Iowa 563, 47 N.W.2d 157; Joiner v. Knieriem, 243 Iowa 470, 52 N.W.2d 21; Blundi v. Blundi, supra, 243 Iowa 1219, 55 N.W.2d 239; Durst v. Roach, supra, 245 Iowa 342, 62 N.W.2d 159; Finken v. Porter, 246 Iowa 1345, 72 N.W.2d 445. Many other decisions might be cited.

For decree in harmony with this opinion the cause is— Reversed and remanded.

THOMPSON, C. J., and BLISS, OLIVER, PETERSON, and GARRETT, JJ., concur.

LARSON and HAYS, JJ., dissent.

THORNTON, J., takes no part.

LARSON, J. (dissenting)—I must respectfully dissent, for

I feel, as did the trial court, that the best interests of these children will be served *by placing them together* in a home with their mother and grandmother. I am greatly concerned with the slight consideration apparently given to this important aspect by the majority. It is agreed that the primary consideration in cases of this kind is the welfare and best interests of the children, but we are not of the same mind as to what that is in this instance. York v. York, 246 Iowa 132, 136, 67 N.W.2d 28.

The majority seem to concede that there is evidence of a material and substantial change in circumstances sufficient to justify a court's exercise of its power to modify custodial care, yet, with little more than a reluctance to change the status quo and a suspicion or fear that the mother will not continue her obviously successful attempt to rehabilitate herself, they decide the trial court abused its discretion by ordering the change. The rule, as I understand it, requires a rather strong showing to rebut the presumption in favor of the mother's custody of small children. Bell v. Bell, 240 Iowa 934, 938, 38 N.W.2d 658, and citations. Also, while it is true our review is de novo, considerable weight, where justified in the record, is given the trial court's decision. Ash v. Ash, 248 Iowa 1310, 1313, 85 N.W.2d 530; Stillmunkes v. Stillmunkes, 245 Iowa 1082, 1086, 65 N.W.2d 366, and cases cited; Finken v. Porter, 246 Iowa 1345, 1347, 72 N.W.2d 445; Justice v. Hobbs, 245 Iowa 707, 708, 63 N.W.2d 882; Watters v. Watters, 243 Iowa 741, 742, 53 N.W.2d 162; Joiner v. Knieriem, 243 Iowa 470, 481, 52 N.W.2d 21, 27, 28, and citations; Durst v. Roach, 245 Iowa 342, 344, 62 N.W.2d 159, 160.

The record clearly indicates the trial court carefully and deliberately weighed the matter. We have repeatedly said the trial court is often in a much better position than we to solve such a perplexing problem, and I think that pronouncement was never more applicable. Here the court visited with these children in his chambers in addition to seeing and hearing the witnesses. Its finding, then, should not be disturbed without compelling reasons, and I find none. Finken v. Porter, supra, 246 Iowa 1345, 1347, 72 N.W.2d 445, and citations, Joiner v. Knieriem, supra, 243 Iowa 470, 481, 52 N.W.2d 21, and citations,

and Slattery v. Slattery, 139 Iowa 419, 116 N.W. 608, refer to the trial court's discretion on matters of this nature.

It is not a question as to whether the present homes of these children have been unsatisfactory. They have, according to the record, been good, and although there is some evidence that the Squires refused to permit the little girl to visit or show affection for her mother when they occasionally met, and the Huebbes have not been sending the boy to Sunday school, yet there is no serious contention that these custodial arrangements have not been satisfactory or disclose circumstances which in themselves would warrant a change. On the other hand, we have held, "If the present custodians are schooling the child to hate the [parent] * * * the welfare of the child might require a change of custody * * *." Shepard v. Gerholdt, 244 Iowa 1343, 1347, 60 N.W.2d 547; Albertus v. Albertus, 178 Iowa 1124, 1127, 160 N.W. 830. We said in Paintin v. Paintin, 241 Iowa 411, 415, 416, 41 N.W.2d 27, 29, 16 A. L. R.2d 659: "It is not shown the mother * * * has attempted to turn them against their father * * *", inferring at least that such an act might be sufficient change in circumstances to warrant a change in custody.

Here the change of circumstances alleged, and I think proven by a preponderance of the evidence, was that plaintiff, the mother of these children, in addition to securing a suitable dwelling place for them, has done a wonderful job of rehabilitating herself since May 1955, when custody of the children was denied her, and has gained the respect of others in the community over a substantial period of time. It should also be pointed out that in its 1955 order the court contemplated this change and reserved jurisdiction to make further orders as the welfare of the children "shall dictate." If she has done that well without the compulsion she would naturally have when her retention of the children's custody would be at stake, I can see no justification in the majority's fear that she will abandon her firm resolution to live a moral, sober and upright life. A man of the cloth believes her. The trial court believes her. Why should we doubt her?

The other reason given for reversing the trial court, a reason which seems to be getting more than its fair share of

weight, is this court's reluctance to change custody of children if their present situation is satisfactory. Lursen v. Henrichs, 239 Iowa 1009, 33 N.W.2d 383; McKay v. Ruffcorn, 247 Iowa 195, 203, 73 N.W.2d 78. Status quo maintenance as applied here is that if there is any chance of error by the move, do not do it. I think such a rule is very bad. There is always a chance of human failure, but we should weigh the benefits for the children and give them consideration along with any detriments. This is not a case where these children, who know their real mother and have visited in her home, will be rudely transplanted to a new and strange environment. Nothing but pleasantness should be anticipated by this change. The facilities offered in the mother's home are quite adequate.

The compelling argument in favor of the trial court's decision, I feel, is well pointed out in Shepard v. Gerholdt, supra, at pages 1348 and 1349 of 244 Iowa, page 550 of 60 N.W.2d where JUSTICE THOMPSON said, "There was * * * a very material factor concerning welfare which the court stressed —the affection between the two sisters * * * and the benefit to Diana from living with the elder girl. * * * We agree with the able and long-experienced trial court that the welfare of Diana will be best promoted by a modification which permits her to live in the same home with her sister."

I hope we have not changed this view, and feel that one of the paramount considerations the courts should consider is that it is for the best interest of the child to be brought up in a home with his brothers or sisters. It should be considered in the same category as the benefit a child gets from a good mother's love and care. Joiner v. Knieriem and Durst v. Roach, both supra. It should be presumed beneficial to the child's welfare.

It is true each case must be decided upon its own facts, but they are not here unfriendly to plaintiff's case. There is no other child in either of the defendants' homes. The Thein children are just now reaching the age when a brother-and-sister relationship becomes important, i.e., the school age. They need the companionship of each other. In their mother's home they will have that, plus their mother's love and care, and an

adequate and proper religious training. They will not only be *sent* to Sunday school, but will be *taken* to the church next door by their mother and grandmother.

I think these factors, when carefully weighed, justified the trial court's conclusion that it would be for these children's best interests to be together in one home, to receive the same love and care from a repentant mother, and to receive the same religious training to prepare them for their family responsibilities of the future.

While I would affirm, I would delete the provision granting defendants the privilege of having the children for two months each summer, for that provision might have the effect of upsetting rather than securing their family discipline and unity. I would prefer to express appreciation for the devotion of these foster parents in other manners than by such a court order. Their unselfish devotion to the child should receive compensation in some other manner than the granting to them of any possessive right in the child. I am sure these children themselves will remember and take care of that gratitude later.

I would modify and affirm.

HAYS, J., joins in this dissent.