HUBERT A. STAGGS, appellee, v. VIVIAN STAGGS, appellant.

No. 49718.

(Reported in 96 N.W.2d 736)

JUNE 9, 1959.

Thomas S. Bown, of Corydon, and Fred Cromwell, of Burlington, for appellant.

Stuart & Stuart, of Chariton, for appellee.

PETERSON, J.—Hubert A. Staggs and Vivian Dold were married at Seymour in Wayne County a short time prior to 1950. They lived with Hubert's parents on a 450-acre farm, owned by the father, near Seymour. In August of 1950 a daughter, Delores, was born. Early in 1952 Vivian left the Staggs home and went to the home of her parents in Seymour. She never returned. She was pregnant, and in June of 1952 a boy, Larry, was born. These two children are the subject of this modification proceeding. Sometime after Larry was born Hubert started a divorce action against Vivian, praying for divorce and custody of the two children. She filed a cross-petition making similar claims. On May 16, 1955, a divorce was granted on her cross-petition and she was granted custody of the two children with right of visitation by the father on Saturday of each week. She was a registered nurse and shortly after the divorce moved to Burlington and accepted a responsible position at Mercy Hospital. On March 1, 1957, she became the mother of an illegitimate child. The father was Earl Jay, a schoolteacher whom she had known for eight or nine years. Upon discovery of this change Hubert filed an application for modification of decree, asking that the custody of the two children be granted to him. Upon trial the court sustained his application, granting defendant visitation rights on Saturday and Sunday. Custody was changed immediately after trial. Defendant has appealed.

Appellant assigns six errors relied upon for reversal, but the material allegations can be consolidated under two alleged errors. 1. The trial court erred in permitting the offering of

940

some testimony as to facts and conditions arising prior to the divorce. 2. The trial court erred in transferring the custody of the two children from defendant to plaintiff under the testimony in the case.

This case is similar to most divorce cases, and cases involving questions of modification, in that it very largely turns upon the facts of the particular case under trial. Such facts at times have similarities, but are rarely identical. This is true of the case at bar. Certain very general and broad principles have been established in divorce cases, which are of assistance in analyzing the facts and rendering a determination.

■ The case is triable de novo, but in a case of this type we give substantial weight to the decision of the trial court. Rust v. Trapp, Iowa, N. O. R., 201 N.W. 565; Wood v. Wood, 220 Iowa 441, 262 N.W. 773; Ellison v. Platts, 226 Iowa 1211, 286 N.W. 413; Zuerrer v. Zuerrer, 238 Iowa 402, 27 N.W.2d 260; Maron v. Maron, 238 Iowa 587, 28 N.W.2d 17. This theory is of special significance in this case. Much depends on the observance of the trial court as to the testimony and demeanor of *plaintiff* and *defendant* as witnesses.

■ The best interest of the children involved in cases of this nature is our primary consideration. It is not our first purpose to chastise or unduly criticize a parent. While it is inevitable that feelings will be hurt, whatever may be the decision, such feelings and the deep desires of each parent must be our second consideration. Neve v. Neve, 210 Iowa 120, 230 N.W. 339; Robbins v. Robbins, 234 Iowa 650, 12 N.W.2d 564; Zuerrer v. Zuerrer and Maron v. Maron, both supra; Stevenson v. McMillan, 250 Iowa 737, 95 N.W.2d 719; Thein v. Squires, 250 Iowa 1149, 97 N.W.2d 156; Ball v. Ball, 250 Iowa 763, 96 N.W.2d 317.

I. Appellant assigns as error the offering of certain evidence as to an occurrence prior to the marriage of Hubert and Vivian. Defendant told plaintiff she was pregnant and they would have to get married. Hubert's mother was doubtful concerning the matter and asked Vivian to submit to a doctor's examination, which she refused to do. She might have been sincere, but it developed after marriage that the statement was not true. This was the beginning of continuous disagreement

between Vivian and Hubert's mother. This being an equity case no rulings were made during the trial as to objections. The matter was in fact without prejudice because the trial court in rendering its decision gave no attention to this matter in its findings of fact.

It is obvious and we have often held that we cannot retry a divorce case under the cloak of an application for modification. The decree normally is a finality. Goodrich v. Goodrich, 209 Iowa 666, 228 N.W. 652; Neve v. Neve, supra; Jensen v. Jensen, 237 Iowa 1323, 25 N.W.2d 316.

There are exceptions to the general rule. If incidents happened prior to the decree which are material and relevant as to the question of the future welfare of children, such facts for such purpose can be shown. We have recently so held in Ball v. Ball, supra.

Appellant cited one case in support of her assignment of error as to this question. Metzger v. Metzger, 224 Iowa 546, 550, 278 N.W. 187, 189. The case does not support the assigned error. It involved a change in the amount of the alimony. The case quoted with approval from Keyser v. Keyser, 193 Iowa 16, 17, 186 N.W. 438, as follows: "When this is done [alimony fixed], such decree is conclusive, and should not be disturbed, unless it is made to appear that the enforcement of the decree will be attended by positive wrong or injustice, under changed conditions. This is the well established and recognized rule of this court."

Under section 598.14, 1958 Iowa Code, the court retains jurisdiction as to children and other matters:

"When a divorce is decreed, the court may make such order in relation to the children, property, parties, and the maintenance of the parties as shall be right.

"*Subsequent changes* may be made by it in these respects *when circumstances render them expedient.*" (Emphasis ours.)

There is some discretion lodged with the trial court as to matters which may be material in consideration of an application for modification by reason of changed conditions. We hold the trial court did not abuse this discretion in permitting evidence concerning the premarital indiscretion of Hubert and Vivian, in view of the fact that later events in the life of Vivian

indicate a tendency along this line. It is proper that we should say that any fault involved was Hubert's equally with Vivian's.

II. In order to properly evaluate the matter of the welfare of the two children it is necessary that we make a somewhat detailed statement of the facts. Delores, now age nine, was born sometime after the marriage of Hubert and Vivian, on the farm occupied jointly with Hubert's parents. Hubert was not a hired man, but operated the farm with his father. As heretofore suggested there was not a feeling of good will existing as between Vivian and Hubert's mother. The testimony shows however that there was a cordial and loving relationship between Delores and her grandmother. When Delores was two years old Vivian was again pregnant. Without advising Hubert or his parents that her absence was to be permanent, she left the home and went to the home of her parents in Seymour. She never returned. Larry was born in June 1952, at Seymour. Vivian carried on her work as registered nurse in the surrounding county seat towns. After it appeared that she was not coming back home Hubert filed a divorce action in 1952, asking for divorce and custody of the children. She filed a cross-petition asking for the same relief. For some reason there was considerable delay in connection with the trial of the case. It was not tried until May 16, 1955, at which time defendant's cross-petition was presented without contest with the exception of the question of custody of the children. This was submitted to the trial court. The court granted the custody to the mother subject to the right of the father to visit the children each Saturday. Support money for the children was also allowed in defendant's favor in the amount of $40 per month.

A few months after the granting of the divorce, defendant moved with the two children to Burlington. She claimed she could not secure regular employment as a registered nurse in the vicinity of Seymour and that she had an opportunity to secure a position in Mercy Hospital at Burlington. During the time of her residence at Burlington she lived in three different apartments. At the time of the trial she was living in an apartment house composed of nine apartments. It was located near the business district of Burlington. Her apartment was partly below street level and the front of the building opened imme-

diately on the street sidewalk. There was a small yard in the rear of the building where the children from all apartments in the house could play. She selected this apartment because it was close to a community nursery where she could take her children during the daytime and was also close to the hospital. Each morning at seven o'clock she would take the children to the nursery and would then go to the hospital, reporting for work at 7:30. She worked until 4 p.m. When the children became old enough to go to school they would leave for school from the nursery and return to the nursery after school. She would then get the children shortly after four o'clock and take them to their apartment home. She only worked five days a week so she had Saturday and Sunday to devote to the cleaning up of the apartment and taking care of such other household duties as necessary.

It should be said in commendation of defendant, as shown by the testimony of her neighbors in the apartment house, that she gave her two children good care and attention. The apartment was clean, and the children were always well dressed and appeared healthy. The only sickness they had was the fact that when he was very small Larry had a slight case of poliomyelitis, which however does not appear to affect him materially at this time.

Shortly after Vivian moved to Burlington a former friend named Earl Jay called her for a date. He was a schoolteacher. When defendant was in nurses' training, in about 1947 or 1948, she kept company regularly with Mr. Jay. They became engaged to be married and he gave her a diamond ring. However, the relationship of engagement only lasted a short time, when she returned his ring. She afterwards married plaintiff. The improper intimacy which resulted in the birth of the illegitimate child was not a matter of a one-occasion affair. Starting early in the fall of 1955 and extending to May 30, 1956, their program of such relationship was continuous. He saw her every two or three weeks and they would go to a night club as a rule and indulge in the drinking of beer and intoxicating liquor. Defendant states that she only drank two bottles of beer on each occasion and nothing else. Earl Jay testified that she drank four or five bottles of beer and also some gin. He

also said she had beer and gin in her refrigerator and they indulged on occasions in her apartment. She denies this. At any rate, according to the testimony of both parties their dates would close each evening with improper intimacy. Earl Jay claimed on his examination in chief that this program ceased in March of 1956. He was apparently trying to testify that he was not responsible for the birth of the little child. However, on cross-examination he wavered and brought the time into April, with a final admission of possibility in May. The testimony against him on this point is overwhelming. On May 30, 1956, defendant's father and mother came to visit her on this Memorial Day holiday. She testified, and both parents testified, that Earl Jay had a date with her on the evening of said day. They stated that he came and took her out a little late in the evening, but that she stayed out until five o'clock the next morning, to the great disgust of her parents. Defendant testified as to improper intimacy during that night. The little boy, who was named Richard, was born on March 1, 1957. At the time of the hearing as to modification defendant had a case pending in court against Earl Jay as to the paternity of the child. Counsel for defendant in oral argument advised the court that he is now paying support money for Richard. This is not in the record and will have no bearing in connection with our decision in the case.

After the divorce in 1955, plaintiff served two years in the Army. He always paid his monthly support money promptly. There was some complaint on the part of both parties as to the matter of plaintiff's visitation, but this was not a serious question in the case. After his Army service Hubert became interested in a young lady who was a member of the same church to which he and his parents belonged, at Centerville. Her name is Wanda. He kept company with her for some time and they were then married. She testified at the hearing. She stated that her mother had been sick and unable to take care of the housework for some years and during her high-school course she had the responsibility of the housework and the care of four younger sisters and brothers. Sometime after graduation she secured a position in the office of the State Treasurer at Des Moines and held that for three years; up until a few days be-

fore her marriage to Hubert. She testified she had seen the two little children and visited with them, having accompanied Hubert to Burlington at some of his visitation periods. She stated she loved the little children because they were Hubert's and she would give them the same love, care and attention as if they were her own. She and Hubert's mother were completely congenial and there was no difficulty in the home life.

During the months of intimacy of Vivian and Jay there was apparently no serious discussion of marriage. She testified that after the pregnancy, and when she told Mr. Jay about the fact, he said that if she would return Delores and Larry to their father he would marry her and they would make a home together with little Richard. She refused to return the children to their father. Earl Jay was a witness in the case and he denies that there was ever any talk about marriage at any time. He is now married to another woman.

■■ III. To give consideration to an application for modification of a divorce decree there must be evidence as to changed conditions between the date of the divorce and the date of the hearing on application for modification. The burden of proof as to such modification rests upon the applicant. Jensen v. Jensen, supra; Beyerink v. Beyerink, 240 Iowa 45, 35 N.W.2d 458; Goodrich v. Goodrich and Wood v. Wood, both supra; Morrison v. Morrison, 208 Iowa 1384, 227 N.W. 330; 27 C. J. S. Divorce, section 317c(5).

In the case at bar there were two important changes in conditions as between the divorce and modification hearing; the home situation and the indiscretion of defendant.

1. When the divorce case was tried defendant lived in an apartment adjoining the home of her parents in Seymour. Her father was the minister of the local church. Seymour was a small town and the children had plenty of room for play and recreation. Thereafter, she moved to Burlington and rented apartments as heretofore outlined. Life of the two children at that time was, and if she had custody for the future doubtless would be, in a crowded apartment. The apartment would be more crowded in the future because there are three children instead of two. Much of the children's time would be spent in a public nursery. The testimony does show that defendant took

the children to Sunday school quite regularly, but with the little baby in the home such regular attendance would be difficult for some time ahead.

On the other hand in the custody of the father they would be out in the country with plenty of fresh air and room for outdoor recreation. Even as small as they were there was evidence that both children were thrilled about the sheep, cattle, hogs and chickens on the farm. The home was large enough so that each child would have a room of its own. Counsel for appellee stated to the court in oral argument that Mr. and Mrs. Staggs, Sr., have now moved to Seymour and established their own home. This is not in the record, so it can have no consideration as far as the decision is concerned. Even with plaintiff's parents in the home the testimony established that there was plenty of room for all adults and the two children in the farmhouse. School facilities were excellent. The farm is on a gravel road and a school bus comes by every morning and takes the children to Seymour and returns them to the farm in the afternoon when school is out. The religious atmosphere of the home is of a very high standard. Not only plaintiff's parents, but plaintiff and his present wife, Wanda, are all members of the same church at Centerville and attend Sunday school for the children, and church service for the whole family regularly every Sunday.

2. The fact of the entrance of the little baby, Richard, into defendant's apartment home, under all of the circumstances of the situation, creates a serious problem for the future with reference to Delores and Larry. Up to the time of trial defendant had lied to the two children and stated that she and Earl Jay were married. The children will soon be entering into their teen-age years. They will be asking pointed questions as children do when they reach that age. The fabrication cannot be continued and before too long the two children will become cognizant of their mother's indiscretion. It cannot help but create a profound impression as to their general morale. While it is true that Richard is their half brother, yet the fact that he is illegitimate will have some effect. In due course it will not be a matter of the children thinking of the facts of the situation

occasionally, as in the father's home, but it will be a matter of daily life with them in the home, with the mother and the illegitimate half brother.

Defendant offered some rather expressive testimony, under cross-examination. She stated:

"I haven't told them [the children] anything about marriage, they have never asked. They think Earl Jay and I are married. I let them believe that. I realize my little girl is going to be confronted with this quite often. *Sex has not been a problem with me.* Hubert and I thought I was pregnant before we were married. I thought I was and so did he." (Emphasis ours.)

There is a grave question as to the advisability of entrusting two children, rapidly developing into teen-agers, to a parent holding this philosophy as to sex.

The trial court was justified in finding that there was a change in circumstances which justified the granting of the custody of the two children to the father.

The order of the trial court as to modification is affirmed. —Affirmed.

All JUSTICES concur except GARRETT, J., who takes no part.