GRACE H. JONES, appellee, v. JOHN PAUL JONES, appellant.

No. 50063.

(Reported in 104 N.W.2d 449)

AUGUST 2, 1960.

Hansen, Wheatcraft & Galvin, of Des Moines, for appellant.

Connolly, O'Malley & McNutt, of Des Moines, and Don J. Wilson, of West Des Moines, for appellee.

PETERSON, J.—The parties were divorced on July 2, 1953. Plaintiff was granted custody of the two sons of the parties; Lawrence, usually called Larry, then age ten, and William, usually called Billy, then age six. Plaintiff was granted $150 per month alimony and $50 per month for each of the two boys as support money. A visitation program was decreed in favor of defendant, involving visitation during the week and certain week ends, and for extended periods during the summertime.

February 24, 1955, on application duly filed, the custody of Lawrence was changed from the mother to the father, without contest. Reciprocal visitation rights were then provided for the boys as between the two parents.

In 1956 plaintiff acquired and moved into a new modern home. In 1957 her aged parents moved into the home; constituting a household of four persons. Defendant married Betty Fry in July 1954 and has established a nice new modern home with a household of three persons.

June 26, 1959, defendant filed application for modification of decree of divorce asking for the custody of William and for cancellation of alimony and support money allowance. After trial the application was denied by the court as to both requests. Defendant has appealed.

The record is lengthy. The questions involved are primarily factual. We will review the important and material facts.

I. Defendant testified at length. He recited in detail many instances which had occurred from 1953 to the date of trial. Many of the details with reference to actions of the two boys and their relationship with both parties appear to be the normal actions of boys in their early teens, varied only to some extent by the fact of the broken home, and the necessity of visitation between two households. The emphasis on the part of defendant was along two lines. First—he contended that after his remarriage, plaintiff was guilty of influencing Billy against his father. Second—that Billy has been influenced by his mother to overemphasize music, and prevented from developing a well-rounded life. We will give attention to the significance of these claims as we present a synopsis of the evidence of the witnesses for each party.

Betty Jones, the second wife of defendant, testified briefly. She stated that she loved the two boys equally well. She supported defendant to the extent that she thought it would be better for Billy if he was reared in the same home as Larry. She has been employed at all times during her marriage and holds a responsible position as office manager and saleswoman.

Lawrence, who is now sixteen years of age, testified at some length concerning the fact that he first lived with his mother and then voluntarily decided to live with his father. He is active in athletic and outdoor events. He stated that he loved his brother Billy very much and enjoyed being with him. It was his conclusion that Billy would be happier if the custody was changed.

Defendant called plaintiff as a witness on his behalf concerning the fact that she has worked since her divorce. She testified that she was working on a restricted time basis in order that she might be at home during all the time that Billy was out of school. She said it was necessary in order to properly maintain her home that she work and earn money in addition to the $200 per month paid her by defendant. Her take-home pay is $44.25 per week.

Plaintiff then testified on her own behalf. She stated that as is so often true with boys in a home, the general nature of the two boys is different. She said: "Bill is an introvert and

Larry is an extrovert. Bill is a much more sensitive person than Larry. There is as much difference between Larry and Bill as between Paul and I. If Bill were put under his domination he would suffer just as I suffered."

She stated that Larry is a fine boy, and defendant and Betty had been doing a good job in rearing him. She outlined in detail the reasons why it would be a mistake to change the custody of Billy from her to defendant. One of the principal reasons is that Billy is intensely interested in music. He has above average ability for playing the piano. He has taken lessons for many years and has won many musical contests at school. He gathers together four or five of the children of the neighborhood, who are musically inclined, into a small orchestra which plays every other Saturday afternoon at his home.

Larry is athletic minded and loves fishing and camping and the outdoors. Billy is the opposite, preferring to spend most of his time indoors developing his musical ability. Defendant is opposed to this. Her testimony was as follows concerning this matter:

"Q. Have you ever known him [defendant] to discourage musical interest on the part of Billy? A. Yes. He has told Billy that playing the piano is a sorry excuse for a livelihood." It is the gist of her testimony that Billy would be completely unhappy if his custody was changed to his father because she is certain that his great ability and great love for music would be discouraged.

As to the other question urged by defendant to the effect that plaintiff has influenced Billy against his father she testified:

"Q. Can you tell us what, if anything, you have done toward persuading Billy to develop a normal attitude of affection toward his father? A. I have told Bill that what he feels toward his father is his affair, that because we had our difficulties that needn't affect that situation at all. He has countered by saying, 'You don't have to tell me anything against him, if I turn against him it is all because of what he does.'"

Plaintiff had a philosophy as to her obligation in connection with Billy's attitude toward his father which might be consid-

ered slightly non-co-operative. As to this question she said:

"Q. What obligation do you feel toward inducing in Billy a feeling of respect and affection toward his father? A. Respect and affection have to be earned and cannot be forced. I am thoroughly convinced of that." Plaintiff amplified her position and theory by the following testimony:

"Q. Will you continue to allow that condition [Billy's attitude toward his father] to exist, or do you propose to change it? A. I haven't gone through life trying to run everybody else's. If love and respect is to be had, it is to be earned. * * *

"Q. What do you propose to do to change it? A. Obviously it depends on Paul's attitude toward the boy, to earn a father's affection. * * *

"Q. * * * do you intend to do nothing further insofar as Billy's attitude toward his father is concerned than you have done in the past? A. I don't know what I could do. We are just at loggerheads. I can't feel anybody can control anybody else's attitude. * * *

"Q. You feel that the situation of Bill's feeling or lack of feeling toward his father is due, from your observation, to the relationship of Paul and the boy? A. Definitely. I think that is the only basis for it."

Two close neighbors of plaintiff were called as witnesses on her behalf. They commended her home life, her rearing of Billy, and her encouragement of his musical ability. Typical testimony of the neighbors is contained in the following testimony by Mrs. Paul Deal, who lives next door:

"I think that home [plaintiff's] revolves around what would be good for Billy and what Bill wants to do. It's a wonderful home. It's a beautiful home to begin with. It's well kept and new and I think that if every child in America had a home and a mother as lovely as Bill Jones has we wouldn't have any juvenile delinquency in this country."

Mrs. Horace Hurlbut, Billy's music teacher testified. She had no information as to the marital or divorce troubles of the parties. Her testimony concerned primarily Billy's ability as to music. She said:

"I have known him intimately as my student since he began

taking lessons, which was when he was seven or eight, I believe seven. * * * Bill is a very, very unusual student, he has unusual music ability; he is very smart. He brings a well-prepared lesson each time on a normal amount of practice. * * * He won a very high state honor at Sioux City last year."

Plaintiff's father, Mr. A. C. Haffner testified on her behalf. He is eighty-four years old, but still very active and busy about the home taking care of the yard and the garden. One of the most significant statements in his testimony was a quotation he made from Larry which he gave as an example of the general attitude the two families should have about and toward each other. They were starting out on a summer trip to Colorado and Mr. Haffner testified that Larry made the following statement: " 'We're going to have a whole month together, and let's not mention any ill things about each other's self during this period of time.' "

Then Mr. Haffner added "That's the way it has been going in the home as I have been in and out of it. * * * As far as I am concerned I would take the position that there shouldn't be any discussion about the parents of the children either in front of them or by any of them. If everybody had kept quiet and let the boys settle it themselves, we wouldn't have been needing all of this controversy."

On behalf of plaintiff the following stipulation was entered into between the attorneys for the respective parties:

"Mr. Connolly: Let me say this. I have other witnesses, and I ought to make an offer that if they were here, persons for reputation, that they would be here to present that the boy was of good character and well rounded in disposition and no trouble and respectful and had talent and that's all I wanted those for, if I had people who are teachers, Sunday school, day school, principal, assistant principal, and then the only other witness we have is Bill himself."

"Mr. Hansen: We'll stipulate that those persons, if so called, would so testify."

Billy testified at length with reference to his love for music and his activities in the field of music. The important matter

in his evidence was the fact that he was bitterly opposed to any change of custody from his mother to his father. He testified:

"Q. In view of that situation would you state which home you would rather stay in? A. I want to live with my mother. * * *

"Q. * * * She [mother] said she felt any attitude you might have about going to your father was due to the relationship between you and your father, and not to any interference on her part; what is the fact as to that? A. Why do I not want to go to my father? Q. Yes. A. The way we do things is different. The way we think is different. The very way we live, the attitudes we have about different things are vastly different. The lectures, as Mommy put it, are another reason.

"Q. What do you mean by lectures? A. Well, talks, which mainly are made at leaving.

"Q. Has your mother been the topic of some of these talks to you? A. Very much so."

A unique situation with reference to this case and the parties involved is that they are all fine persons. Both plaintiff and defendant attend church regularly and both Larry and Billy accompany their parents to church and go regularly to Sunday school. Both households are fine American homes. The specter behind the scene is that in spite of the two households being wholesome and Christian within themselves, they are established on the basis of a broken home, with many misunderstandings inherently arising with reference to children in such a situation.

We desire to emphasize the admonition of the trial court that each party must respect and carefully abide by the visitation rights established in the original and supplemental decrees. As far as humanly possible each party must also abide by the orders of the various trial courts entered throughout the hearings as to refraining from influencing either son against the parent having custody. While in different forms, there have been some violations by both parties of the spirit of these wholesome provisions.

As to the facts of the case the equities support plaintiff. Defendant has failed to prove by the weight of the evidence that

plaintiff unduly influenced Billy against his father, although it can be said that her attitude was not always affirmatively helpful. The evidence clearly establishes that it would be a mistake to take Billy out of the home and the atmosphere which he so strongly loves, and move him into the home of the father, to which he is strongly opposed.

■ Defendant did not establish any change in conditions which would justify changing the amount of the alimony and support money he should pay plaintiff. It is true plaintiff is working and earning a modest amount of money in addition to the alimony and support money. However, in view of the increase in cost of living from 1953 to the present date it is very clear that plaintiff cannot maintain the type of home with her son, to which she is accustomed and entitled, without entering into the employment on a restricted hourly basis in which she is engaged. We agree with the trial court in refusing to modify the amount of alimony and support money.

II. The three legal questions involved are: First—has there been any change in conditions between 1953 and the time of trial? Second—while the case is triable de novo we give consideration and weight to the decision of the trial court. Third, and most important, what is for the best interest of Billy?

■ Was defendant able to establish any substantial changed conditions as between the time of the reaffirmation of original decree of July 1953, in February 1955, and the trial of the case in September of 1959? We have often held such change is necessary to establish a basis for modification. Kinney v. Kinney, 150 Iowa 225, 129 N.W. 826; Spain v. Spain, 177 Iowa 249, 158 N.W. 529, L. R. A. 1917D 319; Keyser v. Keyser, 193 Iowa 16, 17, 186 N.W. 438; McNary v. McNary, 206 Iowa 942, 221 N.W. 580; Newburn v. Newburn, 210 Iowa 639, 231 N.W. 389; Metzger v. Metzger, 224 Iowa 546, 278 N.W. 187; Staggs v. Staggs, 250 Iowa 938, 96 N.W.2d 736.

In Keyser v. Keyser, supra, we said: "When this is done [alimony fixed], such decree is conclusive, and should not be disturbed, unless it is made to appear that the enforcement of the decree will be attended by positive wrong or injustice, *under*

*changed conditions.* This is the well established and recognized rule of this court." (Emphasis ours.)

No substantial changed conditions were established by defendant as to the welfare of Billy, nor as to finances.

 Another legal question is the fact that in a case of this type we give substantial weight to the findings of fact of the trial court. Wood v. Wood, 220 Iowa 441, 262 N.W. 773; Ellison v. Platts, 226 Iowa 1211, 286 N.W. 413; Maron v. Maron, 238 Iowa 587, 591, 28 N.W.2d 17; Justice v. Hobbs, 245 Iowa 707, 63 N.W.2d 882; Staggs v. Staggs, supra; Finken v. Porter, 246 Iowa 1345, 72 N.W.2d 445; Patzner v. Patzner, 250 Iowa 155, 93 N.W.2d 55.

This principle is especially effective in the case at bar. The observations of the able trial court as to the general demeanor of plaintiff and defendant and of the witnesses of each party, together with the frankness, or lack thereof, of various witnesses, were important. By observation of the witnesses the trial court had an opportunity to carefully evaluate the testimony. This does not mean we are abdicating our duty as to trial de novo, but it does mean we give substantial weight to the findings of fact of the trial court.

 The other, and most important, legal question is that we have repeatedly stated that our principal concern is the welfare of the child whose custody is involved. Knochemus v. King, 193 Iowa 1282, 1287, 188 N.W. 957, 959; Neve v. Neve, 210 Iowa 120, 230 N.W. 339; Robbins v. Robbins, 234 Iowa 650, 12 N.W.2d 564; Scheffers v. Scheffers, 242 Iowa 563, 570, 47 N.W.2d 157, 161; Dawson v. Dawson, 249 Iowa 588, 88 N.W.2d 117; Stevenson v. McMillan, 250 Iowa 737, 95 N.W.2d 719; Ball v. Ball, 250 Iowa 763, 96 N.W.2d 317.

In Knochemus v. King, supra, the court said: "It is the duty of a court to leave the child where its interests, welfare and happiness will be best subserved."

In Scheffers v. Scheffers, supra, we quoted the following statement: "When a child is legally placed in a home where it receives good treatment and moral training, it should never be removed from that home, except for the most cogent reasons."

The decree of the trial court is affirmed.—Affirmed.

LARSON, C. J., and GARFIELD, HAYS, THOMPSON, GARRETT, and THORNTON, JJ., concur.

OLIVER, J., not sitting.