32

McDaniel *v.* McDaniel.

(No. 19711—Decided March 31, 1967.)

Common Pleas Court of Highland County.

*Messrs. Wilson, Wilson & Wilson,* for plaintiff.
*Messrs. Hapner & Hapner,* for defendant.

Hottle, J.    Defendant's motion for change of custody having come on for hearing, upon the evidence, arguments and law the court overrules the same.

Because the question presented here is that of giving birth to an illegitimate child and its effect upon custody rights, let it be noted that this court, prior to the Court of Appeals holding in *Wise* v. *Wise,* Number 170, Highland County, would have thought that such occurrences forfeited the mother's custodial rights, although the *Wise* decision did not involve the exact question.    The court has

been unable to find any answer in the Ohio decisions and counsel have cited none. Therefore, this court must give every consideration to the *Wise* ruling, and starting on page 4 of the typewritten per curiam opinion:

"That we believe it quite unnecessary to repeat the observations made by this same Court of Appeals in those cases, as they are especially true in relation to the very young female child involved in this proceeding, except to reiterate his emphasis that so far as any young child is concerned there cannot be any substitute for a natural mother's love and care. Again referring to *Fitzpatrick* v. *Fitzpatrick, supra* (4 Ohio App. 2d 279) we can do no more than reaffirm the position taken by this court at the time of the decision in the *Fitzpatrick case* on March 10, 1965. Before the court may make a substantial change in the custody order there must be a substantial change in circumstances, and a mother who is not shown to be unfit has the natural right to nurture and care for her children of tender years. Ordinarily, the child's best interests are served by her love, care, and attention, keeping in mind the guide line set up by the *Fitzpatrick case,* the *Perry case* and all other cases cited with approval by this Court of Appeals in the two cases heretofore refererd to, we are unanimously of the opinion that the evidence presented in this modification proceeding by the plaintiff appellee was not sufficient to warrant the trial court in changing the custody of the child involved in this proceeding from the mother to the father for the reason that there has not been a change of conditions nor a discovery of material facts existent at the time of entering the previous order and then unknown to the court. In arriving at this conclusion, we have been quite mindful of the possible psychological influence at play under the circumstances of this case, but we cannot forget that the testimony failed, in our opinion, to show any peculiar unfitness for the mother to retain custody of her child. As called for by the *Fitzpatrick case,* the case of *Vincent* v. *Vincent,* 6 N. P. 474, 8 O. D. 160, and the case of *Grandon* v. *Grandon,* 164 Ohio St. 234. Also, in the case of *Coleclaser* v. *Coleclaser,* 2 Ohio App. 2d pages 142-147,

the court said that other things being equal, the custody of a child of tender years, especially a female child, would ordinarily be awarded to the mother.''

Defendant's home, since his remarriage, bears all good reports and the evidence discloses this—when I say reports, I mean the investigator's reports.

The question, then, is whether or not the plaintiff's having become pregnant and giving birth to an illegitimate child, both since the divorce and the award of the custody of the parties' child to her, makes her unfit so as not to have ''the natural right to nurture and care for her children of tender years.''

Turning to authorities outside the state of Ohio, the court has found the following which seem to be as closely applicable as any, and more so than the remainder. The court would make reference to 24 American Jurisprudence 2d, Section 788.

The Court of Appeals of Maryland in *Oliver* v. *Oliver,* 140 A. 2d 908, held in part:

9. ''There is no absolute rule that one who has committed adultery is morally unfit to have custody of child, and circumstances of particular case may justfy awarding minor child to parent who has committed adultery.''

10. ''Guilt of wife may be overlooked in awarding custody of child where she is not grossly immoral.''

11. ''Cessation of adulterous relationship is an important factor in determining whether custody of child should be awarded to erring spouse.''

12. ''On record presented, in husband's action for divorce on grounds of abandonment and adultery, chancellor could not have been charged with an abuse of discretion in awarding custody of three year old daughter of parties to her mother, even if she had committed adultery.''

13. ''Where it appeared that mother had changed her way of life, chancellor was justified in overlooking her past indiscretions in determining whether she should have custody of child.''

(See also *McCabe* v. *McCabe,* 146 A. 2d 768, headnote 5.)

The same court in *Palmer* v. *Palmer*, 207 A. 2d 481, stated in headnote 6:

"Rule by which custody is ordinarily awarded divorced husband instead of adulterous wife is not absolute when adulterous relationship has ceased and appears unlikely to be revived and court may overlook past indiscretions and give her custody of minor child."

The Supreme Court of Illinois in *Peck* v. *Peck*, 157 N. E. 2d 249 at page 257, first column, stated pertinent observations in relation to the question before the court. See also *Smilgus* v. *Smilgus*, 35 N. W. 2d 148, second headnote. The Supreme Court of Iowa in *Staggs* v. *Staggs*, 96 N. W. 2d 736 stated in headnote 8:

"In proceeding to modify child custody provisions of divorce decree, the evidence, including evidence that mother had moved from a small town where children had plenty of room for play and recreation to a crowded apartment in the city and that mother had had an illegitimate child who would be present in the apartment and that father had remarried a religious woman and would keep the child on a farm in a spacious home and would take them to a religious school on Sunday, disclosed such changed conditions after divorce as would warrant changing custody from mother to father."

The conduct of the mother is described at pages 740, 741, and 742. The same court in *Wendel* v. *Wendel*, 109 N. W. 2d 432, stated in headnotes:

2. "Best interest of child is usually served by granting custody to one not at fault in divorce proceedings but such must not be taken as a reward for the innocent and the punishment for the transgressor."

5. "Evidence did not establish that the trial court abused its discretion in granting custody of an adopted 3½ year-old child to the father."

6. "It is not every act of indiscretion or immorality that should deprive a mother of the custody of her children in divorce action, but motherhood is a factor to be given weight in deciding questions of child custody."

The Supreme Court of Nebraska in *Baker* v. *Baker*, 89 N. W. 2d 35, in headnote 5 states:

"Where husband was entitled to divorce, on ground of wife's adultery, wife was neither entitled to alimony nor to care and custody of minor children."

And held in syllabus 2:

"Where a wife is found to be guilty of adultery she is ordinarily an unfit person to have the care and custody of her minor children as against the husband she has wronged."

There seemed to be quite a struggle, between at least two members of the court, with the concurring opinion of Justice Wenke which recites the factual situation.

The same court in *Houghton* v. *Houghton,* 137 N. W. 2d 861, held in syllabus 5:

"Where a wife is found to be guilty of adultery she is ordinarily an unfit person to have the care and custody of her minor children as against the husband she has wronged."

It is this court's conclusion that the 4th District Court of Appeals of Ohio has indicated in the *Wise* decision that the first quotations above would be applied to the factual situation here which revealed, by the evidence of plaintiff, that there were few acts of intercourse, that such relationship has ceased and that she is no longer associating with the unnamed father of the illegitimate child. Other than this illegitimate birth, and the plaintiff's testimony of her acts with the unnamed father, there is no evidence of her misconduct in these respects. Removing this one aspect from the case, the *Wise* decision would preclude any change of custody as of this date. Also, the age of the parties' child is such that questions are not going to arise immediately and the relationship of the children can be such that the effect is minimized in the child's thinking.

Attention should be called to Nelson on Divorce and Annulment, Second Edition, Sections 15.06 and 15.40; also 18 Ohio Jurisprudence 2d, Sections 163, 164 and 172, "Divorce and Separation."

The Court of Appeals of the Fourth Appellate District reiterated in *Fitzpatrick* v. *Fitzpatrick,* 4 Ohio App. 2d 279 at 282 and 283:

"In our opinion, it is a serious matter on such little

evidence to change a child from a mother's care, who has had the child since birth, to another who is the new wife of the divorced husband. There is the natural right of the mother, who is not shown to be unfit, to nurture and care for her child of tender years, and ordinarily the child's best interests are served by the mother's love, care and attention. As stated in *Vincent* v. *Vincent,* 6 N. P. 474, 8 O. D. 160, the court required a showing of peculiar unfitness to justify a refusal of the court to award a mother the custody of a child eight years of age. This is likewise true in the case of a modification of a custody award. See *Grandon* v. *Grandon,* 164 Ohio St. 234.''

The circumstances under which the courts of our sister states in the above decisions changed the custody or granted custody initially to the father were other than the situation revealed by the evidence herein; therefore, there is no doubt in this court's mind as to the ruling by the Appellate Court for this county.

Counsel for plaintiff will draw proper entry reserving defendant's exceptions, submit same to opposing counsel and the court. Defendant will pay the costs, and the court suggests that possibly this factual situation, being so clear cut, might well be presented to the Appellate Court and possibly to the Supreme Court, if it will consider same, so that a decision in the upper courts may serve as a guideline for this question.

Separate Finding of Fact and Conclusion of Law.

Decided July 6, 1967.

Hottle, J. A separate finding of fact and conclusion of law is mandatory upon the court, upon defendant's motion therefor, and the court incorporates its original decision filed March 31, 1967, together with the within finding and conclusion.

The original decision sets out the thinking of the court, and it is used and incorporated as a general finding of fact and conclusion of law for a foundation of the within explanatory finding and conclusion.

The court wishes to make it plain that, although much

of the evidence in this case related to the question of religious differences, the decision herein is not based on that facet of the parties' difficulties.

The question is whether or not the fact that defendant has remarried, has a good home, and particularly, that the plaintiff has conceived and borne an illegitimate child since the original award of custody of the parties' child to her, is a sufficient change in circumstances to award the custody of the child now to the defendant-father.

The court will attempt to distinguish between the facts of the within case and those of the cases which either awarded or ordered a change from the custody in the mother to that of the father.

The case of *Oliver* v. *Oliver* (Md.), 14 A. 2d 908, involved a relationship between a third party and the wife, which relationship had apparently ceased, and the court said at page 912:

"After reading all of the testimony, he concluded that the custody of the three year old child should be awarded to the mother because it was not established that she was an unfit person to have custody. We are unable to find that the chancellor was clearly wrong in so doing, and we see no reason why the award of custody to the mother should not redound to the best interests of the child. Moreover, since the award of custody was a matter within the sound discretion of the chancellor, we are unable to say that he abused his discretion. The adulterous relationship had ceased, and it is not likely that such illicit conduct will be revived since the former paramour has moved to Michigan and has become interested in marrying another woman out there. The mother having changed her way of life, the chancellor was justified in overlooking her past indiscretions. *Trudeau* v. *Trudeau* (1954), 204 Md. 214, 221, 103 A. 2d 563."

In the *Palmer case* (Md.), 207 A. 2d 481, the court stated at pages 482, 483 and 484:

"In addition to the wife's adulterous conduct and her frequenting of an undesirable tavern, the record shows that she interfered with and discouraged contacts between the

father and his son. Also, the child lived in the poorest surroundings in a small, three room trailer in an isolated area, occupied by the mother, Douglas, the former paramour (they were married on February 8, 1964), and their four month old daughter.''

In the *Peck case* (Ill.), 157 N. E. 2d 249, where custody was decreed to the father, the court stated at page 257, after it had been established that the mother had been guilty of adultery: ''On the other hand, if appellant's past conduct and apparent dislike for the confining duties of motherhood are to serve as a guide, there is support for the conclusion that the findings below were prompted by the best interests of the child.''

In the *Smilgus case,* 35 N. W. 2d 148, the court changing the custody to the father, the mother having remarried, having left her second husband and leaving the parties' child with the father's sister, and thereafter the mother having become involved with another man and convicted of a violation of the city ordinance relating to immoral conduct, the court stated at page 149:

''Plaintiff claims to be repentant and willing to devote herself to the interests of the daughter. The place of abode of plaintiff consists of a three room apartment in which she, her husband, and their child must live. The daughter in question, Ellen, would be the fourth person in the three room apartment.

''It seems that plaintiff voluntarily left her daughter's custody with defendant's sister in order to carry out plaintiff's own course of misconduct with Losey. There are compelling reasons why we should distrust the plaintiff's influence over her daughter. Her supposed reformation was of three months' duration.''

In the *Staggs case* (Iowa), 96 N. W. 2d 736, in which the custody was changed from the mother to the father, the court set forth the facts at page 740:

''The improper intimacy which resulted in the birth of the illegitimate child was not a matter of a one occasion affair. Starting early in the fall of 1955 and extending to May 30, 1956, their program of such relationship was con-

tinuous. He saw her every two or three weeks and they would go to a night club as a rule and indulge in the drinking of beer and intoxicating liquor. Defendant states that she only drank two bottles of beer on each occasion and nothing else. Earl Jay testified that she drank four or five bottles of beer and also some gin. He also said she had beer and gin in her refrigerator and they indulged on occasions in her apartment. She denies this. At any rate, according to the testimony of both parties their dates would close each evening with improper intimacy. Earl Jay claimed on his examination in chief that this program ceased in March of 1956. He was apparently trying to testify that he was not responsible for the birth of the little child. However, on cross-examination he wavered and brought the time into April, with a final admission of possibility in May. The testimony against him on this point is overwhelming. On May 30, 1956, defendant's father and mother came to visit her on this Memorial Day holiday. She testified, and both parents testified, that Earl Jay had a date with her on the evening of said day. They stated that he came and took her out a little late in the evening, but that she stayed out until five o'clock the next morning, to the great disgust of her parents. Defendant testified as to improper intimacy during that night. The little boy, who was named Richard, was born on March 1, 1957. At the time of the hearing as to modification defendant had a case pending in court against Earl Jay as to the paternity of the child. Counsel for defendant in oral argument advised the court that he is now paying support money for Richard. This is not in the record and will have no bearing in connection with our decision in the case.''

At page 742 the court said:

''Up to the time of trial defendant had lied to the two children and stated that she and Earl Jay were married. The children will soon be entering into their teenage years.''

''She stated: 'I haven't told them (the children) anything about marriage, they have never asked. They think Earl Jay and I are married. I let them believe that. I

realize my little girl is going to be confronted with this quite often. *Sex has not been a problem with me.* Hubert and I thought I was pregnant before we were married. I thought I was and so did he.' (Emphasis ours.) There is a grave question as to the advisability of entrusting two children, rapidly developing into teen-agers, to a parent holding this philosophy as to sex."

In the *Wendel case* (Iowa), 109 N. W. 2d 432, and in which the custody was awarded to the father, the court stated at pages 432 and 433:

"No fault was found in plaintiff, but the trial court found under the facts and circumstances disclosed by the testimony that defendant was 'totally immoral, without remorse or shame concerning her past conduct and that her character is such that she is not a fit person to have custody of the minor child.' After a careful review of the record and the exhibits, we must agree with the trial court."

"Apparently something went wrong with defendant's plans and she returned during the first week in July and promised that if plaintiff would take her back she would behave herself, never leave again, and would be a good and faithful wife to him. He took her back and believed her until he was shown some letters written by defendant to her paramour sometime in August.

"We prefer not to relate to the contents of the letters introduced as exhibits P-2 to P-9 as it would serve no useful purpose. It is sufficient to note that defendant admitted she wrote them to the other man, that she never intended them to be seen by any other person, and we agree with plaintiff's counsel that the shocking language she used to convey her feelings to her lover, which she said she couldn't help, were better fitted to the barroom than the parlor. We simply observe that they disclose a weakness of character which, if unchanged, would make her morally unfit to have the care and custody of any child, no matter how much she loved it or how carefully she tended its physical needs. These letters disclose contempt for the better values in life, for her legal spouse, and his efforts to satisfy her. They disclose no concern over what her former friends or

relatives thought of her or her conduct, or that she was guilty of the crime of adultery and of actively attempting to break up, not only her own home, but the home and family of a social acquaintance. She expressed no concern as to the three children in the other family. We can reach only one conclusion, that without a complete change as to moral values, she disclosed complete unfitness to give proper moral training to a child, and the burden became hers to convince the court she had changed at the time of the trial. This she did not do, but on the contrary admitted she continued to see the other man. The only expression of regret or sorrow at the trial was that '* * * I made a big mistake.' Without more, this was not sufficient to purge her guilt or strongly indicate an honest reformation. On the other hand, it seems the impression the trial court received as a result of her testimony before it was most unfavorable to her.''

In the *Baker case* (Neb.), 89 N. W. 2d 35, and in which custody was awarded to the father, the court stated at pages 43 and 44:

"Mary E. Baker, appellee's mother, testified that about 10:45 p. m. on July 19, 1956, appellant and Triplett were in the latter's store and turned out the lights and stayed therein until about 1 a. m., July 20, 1956; that many evenings she saw them alone in Triplett's store; and that many times she saw them together and alone at places other than the store.

"Myrl Jones and appellee both testified that on the evening of August 3, 1956, appellant went to the Triplett store; that when she went there she was neatly dressed and tidy in appearance; that apparently a beer party was being held in the store; that about 1:05 a. m. on August 4, 1956, the last guest left leaving appellant and Triplett alone in the store; that all the lights in the store were then turned off except one red night light; that about 1:10 a. m. they saw appellant and Triplett embracing each other; that at dawn (4:45 a. m.) both Triplett and appellant left the store; that when she left her hair was mussed and her clothing untidy, her blouse being pulled out of her

skirt; and that when he left his clothing was also untidy, his shirttail being out of his trousers. There are other incidents of like character described by Jones as having taken place on the evening of September 24, 1956, and again on September 25, 1956.

"Sarah Ann Holm, who worked in the Baker home, testified that in the spring of 1954 appellant was talking to her in the kitchen of the Baker house and there told her the operation she had had, which resulted in some of her female organs being removed, would prevent her from bearing any more children; that she then took some contraceptives (rubbers) from her purse and said that because thereof (meaning the operation) she and Clark (meaning Triplett) would not be needing them anymore; and that she thereupon threw them in the wastebasket.

"Kenneth W. Casey, with whom the Bakers became acquainted when they were running their resort near Park Rapids, Minnesota, in 1955, testified as to appellant's attitude while alone with him, which was on numerous occasions. He testified she tried to induce him to be intimate with her by her conduct and when that was not successful asked him to be, saying she had been intimate with Triplett at Broken Bow and just how they did it on his office swivel chair.

"I could recite additional facts these several witnesses testified to which show appellant's attitude toward and desire for sexual relations with others than her husband during the period of their marriage and while they were living together and the fact that she satisfied such desires with Triplett.

"The record in this case presents one of the strongest cases of adultery against a party that I have reviewed since being on the court and, in my opinion, fully satisfies all the requirements as to the burden of proof which is placed on a party seeking a divorce. It presents a factual situation which establishes the fact that appellant is totally unfit to raise the minor children and the sooner they are removed from her custody and placed with appellee the better it will be for their future welfare."

In the *Houghton case* (Neb.), 137 N. W. 2d 861, the court found that the child borne by the mother, although conceived during the marital relationship with the husband admitting sexual relations with the mother on certain dates but not during the "danger period," was not the child of the parties by reason of blood grouping tests, but yet permitted the mother to have physical custody of the child, and stated at page 872:

"The legal custody of the minor child, Alice Marie Houghton, is placed in the chief juvenile probation officer of Douglas County with instructions to leave the physical custody with her mother, Mary Jean Houghton, under the supervision of such probation officer, during the time she shall properly care for her, and under an environment not inimical to the child's best interests."

From a review of the factual situations in all of these cases and others which the court has not cited and in view of the Fourth District Court's previous decisions, this court is of the opinion that the circumstances in the within case are not sufficient to order a change of the custody of the child involved.

As pointed out in so many words in the court's original decision, he does not put the stamp of approval on the conduct of the plaintiff herein, rather it is evident that all concerned consider such conduct as reprehensible; however, we are faced with the care of a daughter of tender years, and there is no evidence to refute plaintiff's statements that she has ceased such conduct.